[Crim. No. 14063. In Bank. Mar. 5, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL LAWRENCE, Defendant and Appellant.

274

## COUNSEL

Sheela, Lightner, Hughes, Hilmen & Castro and Howard J. Bechefsky for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Ivan Hoffman and Mark Leicester, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—Defendant appeals from a judgment entered upon jury verdicts finding him guilty of kidnaping (Pen. Code, § 207) and assault with a deadly weapon (Pen. Code, § 245).

In this case we hold that the rules of *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California* (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951], do not apply to pretrial photographic identifications made of a suspect after his arrest. We affirm the judgment because there is no evidence that the photographic identification procedure used denied defendant due process of law.

At 8:30 p.m. on February 12, 1968, a man forced Mrs. Susan Ward into his car at gunpoint. About 10 minutes later she escaped, ran to a nearby house, and called the police, to whom she described her assailant. Defendant was arrested about two hours later. The following day at the police station Mrs. Ward identified defendant as her assailant from photographs taken of a simulated lineup conducted earlier that day. No witnesses were present at the time the photographs were taken nor was defendant's counsel present.

Before the trial[1] defendant moved to suppress evidence of Mrs. Ward's identification of him. The parties stipulated that the court's decision on the legality of the photographs of the purported lineup and the admissibility of the identification testimony would be binding at trial, but that defendant would be free to attack the probative weight to be given the identifications.

At the pretrial hearing defendant submitted the preliminary hearing transcript, testified himself, and called Mrs. Ward and David Horn, his attorney, as witnesses.

Mrs. Ward testified substantially as hereinafter set forth. On the evening of February 12, 1968, she was walking home from a neighborhood super-market when she was accosted in its parking lot by a man brandishing a gun. The man stood facing her about two feet away, next to a car. He said, "I'm sorry it has to be you," and forced her into the car. He told her not to give him any trouble or "he would give me this . . . and he pointed the gun and he shot it. . . ." The area around the automobile was illumi-nated and Mrs. Ward could see her assailant clearly. She described him as being about five feet eight to five feet ten inches tall and in his late thirties

---

[1]Identification evidence is properly challenged on *Wade-Gilbert* grounds by means of a pretrial motion to suppress or by a timely objection at the time the evidence is offered at trial. (*People* v. *Martin* (1970) 2 Cal.3d 822, 832, fn. 11 [87 Cal.Rptr. 709, 471 P.2d 29].)

or early forties. She was able to get a good look at his full face and described him as having a medium complexion, dark curly hair at the temples, deep lines and furrows in his forehead and under his chin, and a face that was pockmarked. He was wearing a black trenchcoat, black hat, dark pants and dark pointed shoes.

Mrs. Ward further testified that she had been requested to come to the police station on the day following the incident. She arrived there at about 9 a.m. and recounted her story to Sergeant Duncan. She was told that the police had a suspect in custody, information she also had already received the previous night. Sometime in the afternoon of the same day three color photographs of five men standing in a row were shown by Duncan to Mrs. Ward who apparently had remained at the police station throughout the entire period of time. Each photograph depicted the same five men but different poses were assumed in each of the pictures.

At the photographic identification interview Duncan did not tell Mrs. Ward one of the men was the suspect in custody; nevertheless, she hoped her assailant was among those pictured. Duncan told her to be sure to pick out the right one, by which she understood him to mean that she was to be certain not to pick out someone who had nothing to do with the crime. His statement did not lead her to believe that one of the men was the suspect. Duncan said nothing at all during the time she was looking at the photographs and he did not give her the names of any of the persons in the photographs or any information about any of them. He made no marks on the photographs and did not point out anyone in the photographs. Mrs. Ward testified that as far as she was concerned her assailant was not necessarily to be among the men shown in the pictures.

After looking at the photographs for two or three seconds she pointed out defendant as the person who had accosted her at gunpoint. Duncan then told her that "three other girls had positively identified him." He did not explain that those identifications were made with regard to offenses unrelated to the kidnaping of Mrs. Ward.

Defendant testified that the photographs were taken after he had talked to Mr. Horn, his attorney, and that when being taken to be photographed he told his police escort: "[t]hat my counsel had advised me that it was my right to a fair trial, and that a fair trial I could not have if I participated in police lineups without his presence; and that I should tell the officers— any officers who approached me to participate in any kind of procedure to please notify him and give him an opportunity to be present and we would be more than happy to cooperate in any way, statements, photographs, or anything." Defendant testified that the same police officer had just taken him from a meeting with Horn in the interview room.

Horn testified that on his first visit he had advised defendant to refuse to answer any questions and to say that he did so on advice of counsel, that nothing was said on that occasion about any lineup, but that the subject was mentioned on February 14, the day following the simulated lineup and identification by Mrs. Ward.

The court denied the motion to suppress, ruling that counsel was not required at the showing of the pictures, that the purported lineup was not so unnecessarily suggestive and conducive to irreparable mistaken identification that defendant was denied due process of law, and that there was no evidence to suggest that the pretrial identification would taint an in-court identification.

The first trial ended when the court declared a mistrial after the jurors were unable to arrive at a verdict. At his retrial defendant again moved to suppress the identification testimony. The court denied the renewed motion and indicated that although it disagreed with the original ruling on the pretrial motion it considered itself bound by the parties' stipulation that the ruling would be binding at trial. Defendant contends that the court was not bound by the prior ruling. Because we hold the photographic identification procedure neither entitled defendant to counsel nor denied him due process of law we need not decide this issue.

Although it appears that better police procedures could well have been employed by conducting a true lineup with counsel for defendant and the witness present (and it further appears that ample time and opportunity were available to present such a lineup) the failure to take such action is not the crucial factor in the determination of the case at bench. We are involved only with a photograph of a *simulated* lineup and we see no distinction in this respect between such identifications and identifications made from mug shots or other types of photographic displays. (See *United States* v. *Collins* (4th Cir. 1969) 416 F.2d 696; *Commonwealth* v. *Whiting* (1970) 439 Pa. 205 [266 A.2d 738, 740, fn. 3].) ■ As indicated *infra* the overwhelming weight of authority holds that counsel is not required at a post-arrest showing of pictures. Thus, if the police had cut up the photographs and shown the pictures of the participants individually *Wade* and *Gilbert* would have no conceivable application. We find no basis in logic to reach a different conclusion because pictures of five men standing in a line were shown.

In *United States* v. *Wade, supra,* 388 U.S. 218, the United States Supreme Court held that a pretrial lineup was a "critical stage" of the prosecution at which the accused was entitled to the presence of counsel. ■ *Wade* and its companion case, *Gilbert* v. *California, supra,* 388 U.S.

263, "fashion exclusionary rules to deter law enforcement authorities from *exhibiting* an accused to witnesses before trial for identification purposes without notice to and in the absence of counsel." (*Stovall* v. *Denno* (1967) 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203-1204, 87 S.Ct. 1967]. (Italics added.) ) The court stated that it would scrutinize any "pretrial *confrontation* of the accused" and consider the "particular *confrontation*" involved to determine if counsel's presence was required. (*United States* v. *Wade, supra,* 388 U.S. 218, 227 [18 L.Ed.2d 1149, 1157]. (Italics added.) ) Thus the key issue before this court is whether a photographic identification proceeding constitutes an exhibition or confrontation of the accused to the witness.

In *Wade, Gilbert,* and *Stovall,* the police exhibited the accused to witnesses in person. At such corporeal exhibitions the authorities may require the accused to move about, perform certain acts, don particular clothing, or speak the identical words used by the accused during the commission of the offense. (*United States* v. *Wade, supra,* 388 U.S. 218, 221-223 [18 L.Ed.2d 1149, 1153-1155]; *Gilbert* v. *California, supra,* 388 U.S. 263, 265-267 [18 L.Ed.2d 1178, 1181-1183]; *Schmerber* v. *California* (1966) 384 U.S. 757, 760-765 [16 L.Ed.2d 908, 913-916, 86 S.Ct. 1826]; *Holt* v. *United States* (1910) 218 U.S. 245, 252-253 [54 L.Ed. 1021, 1030, 31 S.Ct. 2].) The witness observes the suspect in person from a short distance performing the very acts the criminal did during the perpetration of the crime. At photographic identification proceedings, however, the accused is not present and the witness observes only static poses of those pictured. When mug shots are used the witness is presented with only a collection of faces. Such a witness does not observe the suspect repeat actions or hear the accused speak. ■ We conclude, therefore, that the showing of photographs of the accused to a witness is not a confrontation or exhibition as those words are used in *Wade* and *Gilbert*. (*McGee* v. *United States* (10th Cir. 1968) 402 F.2d 434, 436, cert. den. 394 U.S. 908 [22 L.Ed.2d 220, 89 S.Ct. 1020].)

It is, of course, true that the possibility of unfairness exists in photographic identifications as well as in corporeal identifications. (*Simmons* v. *United States* (1968) 390 U.S. 377, 383 [19 L.Ed.2d 1247, 1252, 88 S.Ct. 967]; P. Wall, Eye-Witness Identification in Criminal Cases (1965) pp. 74-77, 82-83.) However, "the danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." (*Simmons* v. *United States, supra,* 390 U.S. at p. 384 [19 L.Ed.2d at p. 1253].) As long as the photographs from which the witness made his identification are preserved and available at trial, counsel for the accused, by using them in cross-examination of prosecution witnesses, can easily reveal the possibility of prejudice and thereby

impugn the identification testimony.[2] (*United States* v. *Clark* (E.D.Pa. 1968) 289 F.Supp. 610, 621.) The court also may examine the photos and determine for itself if the display of photographs was fairly presented. (Cf. *People* v. *Beivelman* (1968) 70 Cal.2d 60, 78 [73 Cal.Rptr. 521, 447 P.2d 913].)

In *United States* v. *Collins, supra,* 416 F.2d 696, certiorari denied 396 U.S. 1025 [24 L.Ed.2d 519, 90 S.Ct. 601], the defendant was exhibited in a lineup at which his counsel was present. As some witnesses were not present, the police photographed the lineup and later showed the pictures to those witnesses without notifying defendant or his attorney. The court held that since the display was held "under conditions not embracing the apprehensions of a lineup" counsel was not required when the pictures were shown. (416 F.2d at p. 699.) ■ The overwhelming weight of authority similarly holds that counsel's presence is not required when mug shots or other pictures of a suspect already in custody are shown to witnesses. (*United States* v. *Ballard* (5th Cir. 1970) 423 F.2d 127, 130-131; *United States* v. *Bennett* (2d Cir. 1969) 409 F.2d 888, 899-900, cert. den. 396 U.S. 852 [24 L.Ed.2d 101, 90 S.Ct. 113, 117]; *McGee* v. *United States, supra,* 402 F.2d 434, 436, cert. den. 394 U.S. 908 [22 L.Ed.2d 220, 89 S.Ct. 1020]; *People* v. *Hawkins* (1970) 7 Cal.App.3d 117, 120-122 [86 Cal.Rptr. 428]; *People* v. *Lineman* (1970) 5 Cal.App.3d 1, 4 [84 Cal.Rptr. 891]; *People* v. *Green* (1969) 3 Cal.App.3d 240, 246 [83 Cal.Rptr. 491]; *In re Carl T.* (1969) 1 Cal.App.3d 344, 350, fn. 2 [81 Cal.Rptr. 655]; *People* v. *Vessell* (1969) 275 Cal.App.2d 1012, 1016-1017 [80 Cal.Rptr. 617]; *People* v. *London* (1969) 274 Cal.App.2d 241, 242 [78 Cal.Rptr. 848]; see *McClain* v. *State* (1969) 247 Ark. 33 [444 S.W.2d 99, 102-104]; *Vincent* v. *State* (Del. 1969) 256 A.2d 268, 270; *Commonwealth* v. *Geraway* (1969) 355 Mass. 433 [245 N.E.2d 423, 427-428]; *Barnes* v. *State* (1968) 5 Md.App. 144 [245 A.2d 626, 630].)[3] ■ Accordingly, we conclude the right

---

[2]In *People* v. *Fowler* (1969) 1 Cal.3d 335 [82 Cal.Rptr. 363, 461 P.2d 643], it was contended that it would be possible to reconstruct the lineup from, among other things, photographs taken of the showup line *after* the lineup was completed. This procedure is clearly inadequate because there is no assurance that the *post-lineup* photographs duplicate what the witness actually observed. But when the photographs from which the witness made his identification are preserved the court sees exactly what the witness saw, and an absolute duplication of the identification proceeding is possible.

[3]Contra, *United States* v. *Zeiler* (3d Cir. 1970) 427 F.2d 1305; *Commonwealth* v. *Whiting, supra,* 439 Pa. 205 [266 A.2d 738, 740]; *Thompson* v. *State* (1969) 85 Nev. 134 [451 P.2d 704, 706-707], certiorari denied 396 U.S. 893 [24 L. Ed.2d 170, 90 S.Ct. 189]; *Cox* v. *State* (Fla.App. 1969) 219 So.2d 762, 765; *United States* v. *Collins, supra,* 416 F.2d 696, 701 (Winter, J., dissenting) certiorari denied 396 U.S. 1025 [24 L.Ed.2d 519, 90 S.Ct. 601]; *United States* v. *Marson* (4th Cir. 1968) 408 F.2d 644, 653 (Winter, J., concurring and dissenting), certiorari

to counsel does not extend to post-arrest photographic identification proceedings.

We also find no denial of due process. We are of the opinion that the photographic lineup was not "unnecessarily suggestive and conducive to irreparable mistaken identification." (*Stovall* v. *Denno, supra,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206].) It is true that in the three color photographs defendant is the only participant wearing a gold shirt and gold sweater, whereas the four other men wore white shirts or white sweaters. In *People* v. *Beivelman, supra,* 70 Cal.2d 60, 78, we held, however, that the fact that appellant wore light-colored pants while the other men wore dark-colored pants did not render that lineup unfair. The clothing worn by defendant was not similar to that described to the police by Mrs. Ward, and each man wore a shirt or sweater dissimilar from each of the others. The participants all appeared to be of a comparable age and of similar build. None had distinctive features. ■ As there was nothing in the conduct of the procedure whereby Mrs. Ward was shown the photographs that was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" (*Simmons* v. *United States, supra,* 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253]), the identification testimony was properly admitted.[4]

We conclude that the out-of-court identification was properly received, that defendant was not deprived of his right to counsel and that there was no denial of due process.

The judgment is affirmed.

McComb, J., Mosk, J., and Burke, J., concurred.

**SULLIVAN, J.**—I dissent.

The majority hold that because the victim, Mrs. Ward, did not view the lineup *in corpore* but only through the medium of photographs, the lineup was only "simulated" and not a "true" lineup at all. Therefore, they

---

denied 393 U.S. 1056 [21 L.Ed.2d 698, 89 S.Ct. 695]; *People* v. *Rowell* (1968) 14 Mich.App. 190 [165 N.W.2d 423] (Levin, J., concurring).

*Zeiler,* a third circuit case, overruled *United States* v. *Conway* (3d Cir. 1969) 415 F.2d 158, certiorari denied 397 U.S. 994 [25 L.Ed.2d 401, 90 S.Ct. 1131], without mentioning it or any other contrary authority.

[4]There is also circumstantial evidence that points to defendant's guilt. Defendant was arrested two hours after the crime in a car closely resembling that described by Mrs. Ward as the car driven by her assailant. The car driven by defendant also matched the market manager's description of the one he saw in the parking lot at the time of the offense. An expert police criminologist testified that in his opinion the casing of the bullet found at the scene a few hours after the crime came from the gun found in defendant's possession at the time of his arrest.

conclude, *Wade-Gilbert* rules governing lineup confrontations per se are inapplicable, and the present case is indistinguishable from others holding that the showing of individual photographs or "mugshots" after arrest is not subject to *Wade-Gilbert* restrictions.

I disagree with this reasoning and conclusion on two grounds: *First,* the record clearly demonstrates that the photographic identification procedure in question was undertaken with the conscious purpose of evading the requirements of *Wade* and *Gilbert;* the opinion of the majority therefore stands as an explicit sanction of that evasion and an invitation to dispose of those requirements entirely by replacing corporeal lineups with photographic lineups. *Second,* even if we disregard the evasive conduct of the police in this case as the majority have done, I am of the view that it is improper to resort to photographic identification procedures after arrest when, as in the instant case, the authorities have failed to demonstrate the need to utilize such an inherently less reliable method rather than a corporeal lineup with full constitutional protections.

# I

The record in this case establishes beyond the suggestion of doubt—indeed, establishes out of the mouth of the officer in charge himself—that a photographic lineup procedure was utilized rather than a corporeal lineup solely because the officer realized that defendant had a right to the presence of counsel at a corporeal lineup and, for reasons sufficient to himself, wished to proceed with the identification without the presence of defendant's counsel.[1]

All other requisites of a properly conducted corporeal lineup were present. The witness was on the scene and available to attend a lineup; indeed she had been at the police station for more than four hours when the lineup was finally arranged—not so that she could view it, but rather so that such viewing could be avoided. Defendant was also present; he was under arrest held in custody in the same building. Other lineup participants were available, as were adequate lineup facilities. There was only one missing element: defendant's counsel.

If, as we may assume, the officer in charge was desirous of proceeding with the identification with dispatch, he indeed had several courses of action open

---

[1]The officer, when asked at trial what was the reason for his action, replied: "Well, I really don't know for sure whether there was any particular reason. I know that when I had talked to Mr. Lawrence earlier in the morning he had requested that he wanted to have an attorney. I, *rather than have to go back again and talk to him to see if he would stand in the line-up without an attorney present and everything,* I asked Officer Jarvis if he would take pictures of a line-up and bring them over so we could show them to the witnesses." (Italics added.)

to him. He could have asked defendant if the latter would waive counsel at a lineup; this according to his own testimony, the officer did not do. If no waiver was forthcoming, the officer could have made some effort to learn whether defendant had retained counsel who would be able to be present at a lineup within a reasonable time; this, again according to his own testimony, he did not do. If no waiver was forthcoming and defendant's counsel was not reasonably available, the officer could have made some effort to determine whether a member of the public defender's office could be made available; this he did not do. Rather the officer chose a more ingenious solution to his problem: he conducted a lineup which, in his opinion and that of the majority of this court, was not really a lineup at all,[2] and therefore was not subject to the rules of *Wade* and *Gilbert*.

---

[2]The officer's view involved him and others in semantic difficulties at trial—difficulties which the majority purport to overcome by means of the term "simulated lineup." The following colloquy is representative:

"Q [by defense counsel]: And Mrs. Ward was at the police station at the time the line-up was held; is that correct?

"A. [by Officer Duncan]: At the time the line-up picture was taken; there was no line-up held, so to speak.

"Q: Well, at the time these pictures were taken, she was present at the police station?

"A: At the police station, yes.

"Q: And she had been there for some time prior to that time?

"A: Yes.

"Q: Now, prior to asking for the lineup, had you made an effort to find out if there had been an attorney in to see Mr. Lawrence?

"A. There was no line-up. There was some line-up photographs taken. There was no line-up.

"Q: Well, I am sorry that I am clumsy with the way I asked the question. But prior to the time you asked someone over to the jail to assemble a group of men including the defendant Lawrence and take a photograph of them, prior to your doing that, did you determine whether Mr. Lawrence had been seen by a lawyer or had a lawyer? . . .

"A: He had told me previously in the morning that he was trying to contact one. That's all I know. . . .

"Q: . . . You didn't attempt to find out whether in fact a lawyer had been in to see him before you ordered this picture taken; is that correct?

"A: No.

"Q: It is true at about 10:00 o'clock in the morning that day you were talking to the defendant, isn't that right, when he told you that he was going to try and get a lawyer?

"A: I can't tell you the exact time. It was earlier in the morning.

"Q: Sometime that morning. And at that time you—he told you that he didn't want to discuss it, anything with you without a lawyer, didn't he?

"A: That is correct.

"Q: And didn't you make the statement to him at that time: 'Well, you wouldn't stand in a line-up without a lawyer then, would you?'

"A: No, I did not make the statement to him.

"Q: Is there some—you were quarreling with me when I was misstating the thing

I find it inconceivable that this court would approve such a practice in these circumstances. Whatever we may think of a case where a photographic lineup has been utilized after police have made some reasonable effort to secure counsel, or a case where such a lineup has been utilized because for some reason the witness was unable to physically view the suspect, surely it must be recognized that this case involves a deliberate and conscious evasion of the rules of *Wade* and *Gilbert*. I view with great apprehension the prospect that law enforcement officers henceforth will decide that they can safely hold *all* their lineups without the bothersome presence of counsel if they utilize what will soon be known simply as a "Lawrence lineup."

What we said in a related context in *People* v. *Fowler* (1969) 1 Cal.3d 335, at page 344 [82 Cal.Rptr. 363, 461 P.2d 643], seems especially apt here: "We cannot reasonably suppose that the high court . . . would announce a rule so susceptible of emasculation by avoidance." The majority seem to have summoned up the requisite powers of supposition.

## II

Even if we ignore the taint of evasive conduct present in this case and consider the photographic identification procedure apart from the motivation which brought it about, I believe that fidelity to the principles of *Wade* and *Gilbert* as well as adherence to prior decisions of this court require us to conclude that it is improper to resort to photographic identification procedures after arrest when, as here, the People have not established the need for such an inherently less reliable means in the place of a corporeal lineup with full constitutional protections.

At the outset it should be emphasized that, as we said in *People* v. *Gould*

about a line-up because you contend that this is not what you mean by a line-up when merely five people's pictures are taken in a group for identification purposes.

"A: What do you mean I was quarreling with you?

"Q: Well, when I would say 'line-up,' you would keep saying there was no line-up held.

"A: Well, there was no line-up held.

"Q: In other words, you regard this as not a line-up?

"A: I regard a line-up as a group of men put in the line-up room and viewed by witnesses and victims.

"Q: Well now, is that the reason that Mrs. Ward was not taken to the line-up room when these pictures were taken?

"MR. LUX [the prosecutor]: I would object to that as irrelevant; why she was taken or not, your Honor. The issue as to the legality of her identification is at issue, not why he did something or why he didn't.

"THE COURT: Well, I think we are getting into a matter of semantics. *No matter what you call it, it's a line-up; whether you take a picture of it or a witness is there.*" (Italics added.)

(1960) 54 Cal.2d 621, 631 [7 Cal.Rptr. 273, 354 P.2d 865], "Identification from a still photograph is substantially less reliable than identification of an individual seen in person." (See also 3 Wigmore, Evidence (3d ed. 1940) § 786a, pp. 165-166; Wall, Eye-Witness Identification in Criminal Cases, ch. III.) This is so "[b]ecause of the inherent limitations of photography, which presents its subjects in two dimensions rather than the three dimensions of reality, and which presents a 'frozen' image, often not too similar to the image of the living, moving subject. . . ." (Wall, *supra*, at p. 70.) As a result, the dangers of misidentification inherent in pretrial extrajudicial confrontations generally are augmented when such a confrontation occurs through the medium of photography, and the likelihood of irreparable[3] misidentification is enhanced.

In spite of these risks, however, it is clear that photographic identification procedures can play an effective and proper role in law enforcement—notably when the identity of the suspect is unknown or there is no prisoner in custody. As the United States Supreme Court said in *Simmons* v. *United States* (1968) 390 U.S. 377, at page 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967], "Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." Accordingly, in *Simmons* the court held that it would not prohibit the use of photographic identification techniques per se but would consider each case on its own facts and set aside convictions based upon in-trial identification following pretrial photographic identification "only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (390 U.S. at p. 384 [19 L.Ed.2d at p. 1253].)

Turning its attention to the case before it the court in *Simmons* was careful to emphasize that it was *"not suggested that it was unnecessary* for the FBI to resort to photographic identification in this instance." (Italics added.) (390 U.S. at p. 384 [19 L.Ed.2d at p. 1253].) The court went on: "A serious felony had been committed. The perpetrators were still at large.

---

[3]In *Wade* the court was careful to express its realization that as a practical matter a witness's first identification of a suspect as the guilty party is not likely to be altered through judicial confrontation because the witness is reluctant to admit error. (388 U.S. at p. 229 [18 L.Ed.2d at p. 1158].) This problem is also augmented when photography is used as the medium of extrajudicial confrontation. "[W]here a photograph has been identified as that of the guilty party, any subsequent corporeal identification [extrajudicial or judicial] of that person may be based not upon the witness's recollection of the features of the guilty party, but upon his recollection of the photograph." (Fn. omitted.) (Wall, *supra*, at p. 68.)

The inconclusive clues which law enforcement officials possessed led to Andrews and Simmons. It was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces in Chicago and, if necessary, alert officials in other cities. *The justification for this method of procedure* was hardly less compelling than that which we found to justify the 'one-man lineup' in Stovall v. Denno, supra [388 U.S. 293 (18 L.Ed.2d 1199, 87 S.Ct. 1967)]." (Italics added.) (390 U.S. at pp. 384-385 [19 L.Ed.2d at pp. 1253-1254].)[4]

However, a distinction must be drawn between the use of photographic identification techniques in circumstances such as those in *Simmons* (i.e., where the perpetrator of the crime is still at large and speedy action is required) and the use of such techniques in circumstances where a suspect is in custody and witnesses are available to view him in a lineup. Here it is much more difficult to justify resort to the inherently less reliable technique. As a thoughtful commentator has put it: "[W]itnesses should be asked to examine photographs only when a proper corporeal identification is impossible (as where no suspect has yet been found) or difficult. In any other case, the use of photographs is improper, for it constitutes the unnecessary employment of an identification procedure clearly inferior in reliability to one which is available." (Wall, *supra,* at p. 70.)[5]

Recent decisions of this court, although couched in language of "attachment" of the right to counsel,[6] nevertheless offer support for the distinc-

---

[4]Even in England, where courts are quite scrupulous in insisting upon fair identification procedures, the use of photographic identification techniques to apprehend a suspect still at large is permitted and approved. (See Wall, *supra*, pp. 70-71, and cases there cited.)

[5]The view of the English courts on this matter is shown by the case of *Haslam* (1925) 19 Crim.App. 59. There witnesses had been shown photographs of the defendant, who was in custody, before being called upon to make a corporeal identification of him. The court said: "It is not suggested that the photographs were shown to the witnesses that the police might obtain a clue to the direction in which enquiries might usefully be made, or to the person whom it would be proper to arrest. The appellant had already been arrested, and the effect of what was done was to give the witnesses— or certainly three of them—an opportunity of studying a photograph of the appellant before they were called on to identify him. That course is indefensible. It cannot be right that when a witness, or a possible witness, is being called on merely to identify a person who is already arrested, that witness, before the identification, should be shown a photograph of the accused person. One can see that sometimes it will happen that when a person has been shown a photograph to assist in the arrest of a wrongdoer not yet arrested he may later give evidence of identification. That is a different thing from what happened here. In that case the person is asked to identify the accused person, notwithstanding the fact that he has previously seen a photograph. A person who has seen a photograph of the accused person may identify him simply because he has seen a photograph of him."

[6]The majority, by framing its decision in terms of whether or not *Wade-Gilbert* rights "attach" to photographic identifications, successfully misses the point. The ques-

tion here urged. Thus in *People* v. *Fowler, supra,* 1 Cal.3d 335—wherein this court first interpreted and applied the *Wade-Gilbert* rules—we declined to express any specific opinion as to the extent to which those rules would be applied to pretrial confrontations occurring out of the context of a formal lineup, but we did indicate that we would scrutinize such nonlineup confrontations and balance *"the need for a prompt nonlineup identification in light of the circumstances,* against the need for and ability of counsel to help avoid erroneous identification." (1 Cal.3d at p. 345, fn. 16.) In *People* v. *Martin* (1970) 2 Cal.3d 822 [87 Cal.Rptr. 709, 471 P.2d 29], applying this rationale to disapprove a one-to-one viewing of the suspect by the witness, we concluded that the need for identification outside the context of a formal lineup was slight when the suspect was in custody at the police station and the witness was present to view him. "Nothing has been shown which would indicate that a formal lineup with full constitutional protections was rendered impractical by the circumstances. Indeed, it appears that at least two persons of defendant's general physical characteristics were available for this purpose." (2 Cal.3d at p. 829.)

In view of all of the foregoing I am of the view that the following analysis should be utilized in cases such as that at bench: The formal corporeal lineup with full constitutional protections is the most practically efficient and accurate means of extrajudicial identification presently available to us. (Cf. *United States* v. *Wade, supra,* 388 U.S. 218, 239, fn. 30 [18 L.Ed.2d 1149, 1164, 87 S.Ct. 1926], where the "scientific method" of pretrial identification suggested by Wigmore is discussed.) As such it should be the archetype of extrajudicial identification procedures. The utilization of any less reliable identification technique should be proscribed absent adequate justification. Such justification will in most cases take the form of the unavoidable absence of one of the elements requisite to a formal lineup. Thus, in a case like *Simmons* v. *United States,* where the perpetrator of a crime remains at large and speedy identification is necessary to his capture, the *suspect* himself is absent. Another case might be imagined where the *witness* would not be available to attend a formal lineup (e.g., *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967]). Another example of immense practical significance is the case where *counsel* is found after reasonable efforts to be unavailable to attend a lineup within a reasonable time. (See *People* v. *Keim* (1970) 8 Cal.App.3d 776 [87 Cal.Rptr. 597].) In each of these cases ample justification might be shown in order to warrant some means of extrajudicial identification (photographic or otherwise) other than a corporeal lineup.

tion here is not whether the full protection of *Wade* and *Gilbert* shall or shall not apply to non-corporeal confrontations; the question is whether law enforcement officials shall be permitted to substitute a less reliable identification technique for a more reliable one without justification.

In a case such as that at bench, however, where there is absolutely no justification for extrajudicial identification outside the context of a formal lineup with full constitutional protections, such identification should not be permitted, and the witness who participates in the nonlineup procedure should be foreclosed from making an in-court identification.

In summary, I am of the view that it was error to admit the in-court identification of defendant by the victim Mrs. Ward because (1) the pretrial photographic identification procedure which preceded that in-court identification was utilized with the conscious purpose of evading the requirements of *Wade* and *Gilbert,* and (2) the People have failed to show any justification for their use of an inherently less reliable means of pretrial identification in preference to the more reliable corporeal lineup procedure with full constitutional protections.

I would reverse the judgment.

Peters, J., and Tobriner, J., concurred.

Appellant's petition for a rehearing was denied March 31, 1971. Peters, J., Tobriner, J., and Sullivan, J., were of the opinion that the petition should be granted.