[Crim. No. 4633. Fourth Dist., Div. One. Feb. 24, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
OLIVER ALFRED GEORGE, Defendant and Appellant.

768

Identification

## COUNSEL

David S. Folsom, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Jay D. Coulter, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**WHELAN, J.**—Oliver Alfred George (defendant) has appealed from a judgment imposing sentence upon five counts of first degree robbery, of which a jury found him guilty. There were five victims, but execution of sentence was stayed as to all counts but one, the stay to become permanent when sentence on the one count should have been served. The sentence was made concurrent with any prior sentence.

The sole appellate contention is there was error in permitting three in-court identifications of defendant, because of claimed unfairness in pre-trial photographic identifications; and in receiving evidence of those pre-trial identifications.

We set out the evidence relevant to those issues, and defendant's evidence as to alibi which might tend to throw doubt upon the identifications.

The five robberies occurred on Monday, September 7, 1970, which was Labor Day, at about 5:30 a.m. in a service station at 3010 Market Street, San Diego. The service station was at the northeast corner of the intersection of 30th Street, running north and south, with Market Street running east and west.

The first of the victims to see the robber was Michael A. Marrs, an

attendant at the service station who had been on duty since 10 p.m. of September 6. At about 4 a.m. he saw a man carrying a small gasoline can come onto the service station property; the man entered the rest-room, came out, walked onto 30th Street northerly away from Market; at about 5:30 a.m. the man came onto the station property again, carrying the can by a handle that crossed the upper part; between the handle and the man's fingers was a piece of cloth; he asked Marrs to fill the can with gasoline; when Marrs had filled the can he saw that the man was in the front office within the building on the station lot; also within that room was Mrs. Shrum, the bookkeeper, whose husband was manager of the station; Marrs entered the office, saying, "Here's your gas can"; the man then displayed a pistol which he held in his right hand, and said, "This is a holdup; don't move; put the money in my pocket"; Marrs had recognized the man as someone he had seen before, without knowing his name; while receiving the gas can from the robber, and all the while in the office, Marrs had been only about 18 inches from the robber.

At that point the robber had already held up the bookkeeper.

Mrs. Shrum, who had come to work at 5:30 a.m., had been seated at her desk in the office for a few minutes when she sensed something, turned and saw a man reaching into an open safe behind her; while the outer door of the safe was open, an inner compartment was locked shut except for a slot for the deposit of money; the man asked her to open the safe and displayed a pistol; she said she was new on the job and did not know how; the man then removed the contents of a drawer where money from sales of cigarettes was kept.

The second victim was David Sieling, an employee who had just come on duty; he came into the office and the man pointed the weapon at him and said he wanted some money; Marrs came in next; Dean Shrum, the manager, who had been in a rear office with an entrance opening from the office where his wife worked, came through that doorway and re-ceived a like greeting; the gun was held at Shrum's back for a while and also directed at his front; during that time the pistol was cocked; the robber demanded of him that he open the safe; he, too, claimed inability and also told the robber the weekend receipts had been deposited in a night deposit bank facility; as the result of experience with weapons in the navy over many years, he recognized the weapon as a .22 calibre revolver. Jimmie Laray Hurd, a taxi-driver, known to Mrs. Shrum, had also come in; Shrum, Mrs. Shrum, Hurd and Sieling were asked for and turned over billfolds to the robber; shortly afterwards the robber said something in-dicating he thought someone was calling the police and ran out and beyond Mrs. Shrum's vision.

Defendant testified in support of his defense of alibi, and presented the testimony of Grace Patton and Tommy Ellis to corroborate it.

After testifying he did not commit the robbery, he said he had been familiar with the service station for many years; he had been at an after-hours party at the home of Grace Patton at 3302 B Street from some time before 4 a.m. until 7:30 a.m. when he left, drove home, obtained some clothing, walked to a pay telephone booth; called his mother to look after his two children; walked back home; drove to the house of a friend; arranged to leave the car in her care and had her husband drive him in the husband's car to the San Diego airport where he arrived at 7:55 a.m. to take off for the Bay Area by an 8 a.m. airplane. He said he had been convicted of first degree robbery not long before the trial of the present action.

Grace Patton testified she gave a party on Labor Day commencing at 2 a.m.; defendant, whom she had not previously known, came there at about 2:30 a.m. and was there at 7 a.m. when she went to bed; she had seen some of the approximately 100 guests leave the party and return later; had not seen defendant do so; her answer to one question implied the party was on Sunday morning.

Tommy Ellis, a corporal in the marine corps, was Grace Patton's boyfriend and attended the party; he had seen the defendant, whom he had not known previously, shooting craps until about 4 a.m. when the game broke up; after that he saw defendant almost continuously until about 7 a.m. Ellis was sure the party took place on Friday or Saturday. It was usual for him to come to Mrs. Patton's from his post of duty on Friday evening; he had done so on the night before the party and had stopped en route at the Wayside Club in Mission Beach.

At the trial Shrum, Mrs. Shrum and Marrs all made positive identifications of defendant as the robber. Mrs. Shrum and Marrs had also made photographic identifications of the robber before defendant was arrested. The photographs identified were of defendant.

Hurd testified he could not identify the robber; Sieling testified he did not remember ever having seen defendant before; each man, called as a witness for the prosecution, testified he did not look closely at the robber's face and noted only that he was black, wore a tight-fitting silk cap, and wore a goatee and moustache.

As to the opportunity for seeing the robber, the man had been within Mrs. Shrum's observation, within a distance of 3 feet, for 10 or 15

minutes continuously; the interior of the station office was well-lighted by artificial lighting, and the outside was illuminated by powerful lights.

Marrs had seen the robber enter the service station at 4 and at 5:30 a.m., and had recognized him as someone he had seen before. After Marrs went into the office and was robbed, he remained there with the robber for several minutes.

Shrum's opportunity for observation is included in the recital of the evidence.

The circumstances of the photographic identifications were these:

Richard O. Morse, a San Diego policeman assigned to investigate the robberies, got in touch with the victims. He interviewed Shrum on September 7 at the service station, and showed him photographs, none of which was selected by Shrum as that of the robber.

Morse talked to Marrs on September 13 in front of Marrs' residence and showed him between 20 and 100 black and white photographs, none of which Marrs selected as that of the robber. Later the same day Morse returned with two groups of photographs; Marrs looked through one group and rejected them; from the second group, made up of 12 Polaroid color photographs, Marrs selected one as that of the robber.

On September 14 Morse returned to the service station and showed Shrum six black and white photographs, to one of which Shrum pointed a finger and made a statement he felt that was the man who had held him up; he was not positive but was fairly sure. The photograph was of defendant. Morse then showed Shrum the 12 color photographs from which Marrs had selected one; Shrum did not pick out any of those.

Later that day Morse showed to Mrs. Shrum the six black and white photographs seen by her husband, none of which was selected by her; she was then shown the 12 Polaroid color photographs shown to Marrs and Shrum; she spread them out on the desk and selected a photograph of defendant, the same that Marrs had selected.

 Defendant relies heavily upon the decision in *People v. Citrino,* 11 Cal.App.3d 778 [90 Cal.Rptr. 80], on the strength of which he would have us hold the in-court identifications made were tainted by the claimed impermissible suggestiveness of the photographic identifications. A consideration of the *Citrino* decision is called for.

In *Citrino,* three witnesses identified the defendant at trial after the defendant had requested and obtained an extra-jury hearing to have it

determined whether pretrial photographic identifications were impermissibly suggestive. The trial court held they were not; the Court of Appeal held as a matter of law that as to two of the witnesses the photographic identifications made by them on the day before trial were so impermissibly suggestive as to taint the in-court identification, and that no independent source had been shown for the in-court identifications; as to the third witness the reviewing court found substantial evidence to support a trial court finding there was a sufficient source for in-court identification, independent of the photographic identification. Because there was a defense of alibi, the Court of Appeal reversed because the two identifications that should have been excluded might have tipped the scales against the defendant.

The court in *Citrino* went beyond what was necessary to decide the case, seeming to ordain in terms not restricted to the facts of that case a procedure to be followed whenever a defendant objects to an in-court identification not yet made. *Citrino* declares any such objection calls for an extra-jury hearing in which the prosecution must establish as a preliminary fact, under Evidence Code section 402, that the "proffered evidence," i.e., the in-court identification, is admissible, showing by a preponderance of the evidence that the identification procedure employed was not in fact overly suggestive.

That broad declaration was not called for because in *Citrino* the trial court had followed that procedure.

For that and other reasons we question the universal applicability of the declaration as quoted in the footnote[1] below without doubting the soundness of the decision actually made. If what we consider to be a dictum in *Citrino* is a declaration of existing law, we criticize it as placing an unnecessary additional burden on an already overtaxed judicial system.

An in-court identification in theory might be made by a witness who had never made a pretrial identification. An objection made to an in-court

[1]"The questions for determination by the trial judge may be likened to those presented where the accused attacks the validity of an arrest or of a search and seizure. In such cases, as in the present case, the accused is asserting that the prosecution proceeded illegally in obtaining evidence which may lead to his conviction. That claim places upon the prosecution, as the proponent of the identification evidence, the burden of showing that the offered identification testimony is admissible. [Citations.] The trial court must determine, as a 'preliminary fact' within the meaning of Evidence Code section 402, whether the prosecution has shown, by a preponderance of the evidence, that the identification procedure employed was not in fact overly suggestive. The court's determination of the 'preliminary fact' is final in the sense that the admissibility of the proffered evidence is thereby established." (*People* v. *Citrino,* 11 Cal.App.3d 778, 783 [90 Cal.Rptr. 80].)

identification expected to be made where there has not been any pretrial physical confrontation of the defendant by the witness should not throw a burden upon the prosecution of showing more than that the witness was present at the commission of the crime and saw the perpetrator. To require an extra-jury session to establish that fact should be unnecessary.

■ Where there has been a pretrial physical identification of a defendant denied the right to counsel the prosecution in every case must show that there was a sufficient independent source for the in-court identification. (Cf. *United States* v. *Wade,* 388 U.S. 218, 242 [18 L.Ed.2d 1149, 1166, 87 S.Ct. 1926, 1940].)

The same is not true in every case where there was a pretrial photographic identification.

■ We agree that the burden is placed upon the prosecution to show the foundational fairness of a pretrial photographic identification of which it offers evidence.

To say, in other cases, that because there was a pretrial photographic identification there must be a determination by the court of the existence of a preliminary fact under Evidence Code sections 401 and 402, in which the burden of proof is placed upon the prosecution, is, we suggest, not within the meaning of those sections if the in-court identification is considered the "proffered evidence."

■ In the case at bench it cannot be known whether the prosecution would have offered the photographic identifications in evidence if the defendant had not first raised the question of their fairness resulting in the trial court's determination they were not impermissibly suggestive. In fact it was defendant who presented to the jury photographs from which the identifications were made.

■ However, if the only challenge to the in-court identification is the claimed unfairness of a pretrial photographic identification which the prosecution has not attempted to put into evidence, the defendant has the burden of making at least a prima facie showing of unfairness.[2]

---

[2]Certain language from *People* v. *Citrino,* 11 Cal.App.3d 778, 784 [90 Cal.Rptr. 80], seems to be unconsciously in accord with our views: "As to the witnesses Cariglia and Vanderwerff, appellant made a strong showing that the photographic identification procedure used was impermissibly suggestive. . . . The prosecution, on the other hand, could defend the identification only by showing that the witnesses had briefly seen the man they identified as appellant and that their identification was uncertain. Nothing further was shown by the prosecution to justify the procedure employed, to substantiate the identifications, or to show that they had a source independent of the photographs.

"There was thus no substantial evidence to counter appellant's showing that the

The rules relating to physical confrontation identification of a person in custody do not apply to photographic identification of a person in custody. (*People* v. *Lawrence*, 4 Cal.3d 273 [93 Cal.Rptr. 204, 481 P.2d 212].) As stated in that decision: "[T]he possibility of unfairness exists in photographic identifications as well as in corporeal identifications. (*Simmons* v. *United States* (1968) 390 U.S. 377, 383 [19 L.Ed.2d 1247, 1252, 88 S.Ct. 967]; P. Wall, Eye-Witness Identification in Criminal Cases (1965) pp. 74-77, 82-83.) However, 'the danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error.' (*Simmons* v. *United States, supra,* 390 U.S. at p. 384. . . .) As long as the photographs from which the witness made his identification are preserved and available at trial, counsel for the accused, by using them in cross-examination of prosecution witnesses, can easily reveal the possibility of prejudice and thereby impugn the identification testimony. (*United States* v. *Clark* . . . 289 F.Supp. 610, 621.) The court also may examine the photos and determine for itself if the display of photographs was fairly presented. (Cf. *People* v. *Beivelman,* 70 Cal.2d 60, 78.)" (Pp. 278-279.)

 Initially the present case is differentiated from cases such as *People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336], and *People* v. *Martin,* 2 Cal.3d 822 [87 Cal.Rptr. 709, 471 P.2d 29], where there was a physical lineup in which a suspect in custody was identified, or *People* v. *Lawrence, supra,* 4 Cal.3d 273, in which there was a photographic identification of a suspect already in custody, and the chief question was whether there was a denial of a right to counsel at the time of identification.

Speaking for the court in *Stovall* v. *Denno,* 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203-1204, 87 S.Ct. 1967, 1970], Justice Brennan said: "*Wade* and *Gilbert* fashion exclusionary rules to deter law enforcement authorities from exhibiting an accused to witnesses before trial for identification purposes without notice to and in the absence of counsel."

The reasonableness of the showing of photographs to an eyewitness for the purpose of possible identification of the perpetrator of a crime, where an arrest has not yet been made, has been recognized. (*Simmons* v. *United States,* 390 U.S. 377 [19 L.Ed.2d 1247, 88 S.Ct. 967].)

 In *Simmons* v. *United States, supra,* at page 384 [19 L.Ed.2d at page 1253], the court said: "[W]e hold that each case must be considered

procedure employed was suggestive, or to show that the in-court identifications had a valid basis. It was therefore error to permit those identifications to be made in the presence of the jury."

on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

In the trial of the instant case, defense counsel asked for and was given an extra-jury *voir dire* hearing to attempt to show that in-court identifications expected to be and which were made were tainted by the photographic identifications previously made by the witnesses.

Mrs. Shrum was examined by defense counsel on the *voir dire* hearing. She was shown nine photographs which had been marked for identification but not identified in any way, and asked in how many of them the subject had a moustache or goatee; an objection to the question was sustained. Thereafter Mrs. Shrum was asked if she remembered having seen the photographs before; she remembered having seen only two of them. She was shown nine more photographs; it seemed that she had seen some of them before; the photographs she remembered having seen had been some of those given to her by Officer Morse for identification. Among them was the single photograph of defendant she had selected and pointed out to Morse.

Nothing was developed as to the manner in which the photographs were presented to Mrs. Shrum, or other conduct or speech of Morse that so much as suggested unfairness in the procedure.

Defendant now claims that the sustaining of the objection to the question put to Mrs. Shrum was error and denied to defendant his right to show the unfairness of the identification procedure.

The photographs shown Mrs. Shrum in the *voir dire* hearing were examined by the court in that hearing. When the question to which objection was sustained was asked, it had not been shown that the witness had seen any of the photographs before; at that point it could not have mattered what they showed; and, since the court examined them and they were later received in evidence, they are the best evidence of what they show. We see no possible damage to defendant in the court's ruling.

The question whether the photographic identifications were overly suggestive must in this case be answered by the photographs themselves.

Our inspection of the 18 photographs marked for identification in the *voir dire* hearing leads us to believe that the trial court correctly ruled there was no such unfairness in the photographic identification as to taint the in-court identification.

Of the nine photographs first shown Mrs. Shrum by defense counsel, eight were in color, one in black and white (defendant's exhibits A through I). Only the subject of the black and white photograph (defendant's exhibit I) had both moustache and chin whiskers; the subjects of three of the color photographs had fairly well marked moustaches; defendant's photograph was not among that group.

The second group of nine photographs (defendant's exhibits J through R) shown by defense counsel to Mrs. Shrum in the *voir dire* hearing contained four in color, five in black and white. Of the four in color, only one (exhibit R) showed a man with a moustache and chin whiskers; of those in black and white, three of the subjects (exhibits J, M and N) wore moustache and chin whiskers. Exhibit R was identified by Mrs. Shrum as the one she had picked out as that of the robber from a group of photographs shown her by Officer Morse.

Mrs. Shrum had not picked out exhibit N, which also was of defendant; nor exhibit I, whose subject strongly resembled defendant in exhibit N, wore a moustache and chin whiskers, and had the same family name as defendant.

After Mrs. Shrum had been examined in the *voir dire* hearing, defense counsel argued his motion to exclude the in-court identification. In doing so he emphasized the hair style of the defendant in exhibit R as being so distinctive as to compel the selection of that photograph as that of the robber. In it defendant was shown with hair some of which had been gathered on either side of the head in small sharp points or horns. If hair-styling that lent prominence were the test, two others among the colored photographs would qualify.

The number of photographs shown Marrs, who first made a photographic identification, and the number shown the other witnesses after that first identification, strengthens our opinion that the process of identification was fair and neither its purpose nor effect was to influence the persons to whom the photographs were shown to select any one of them as that of the robber.

Defendant's argument is based upon certain presuppositions: one is that every witness to the commission of a crime, testifying in court as to the identity of the person committing the crime, will have been influenced unfairly by having earlier selected a photograph of the person identified; the second is that the selection of the photograph will not have been based upon the actual viewing by the witness of the original of the photograph at the time of the crime.

In logic it would seem to be more probable that in the circumstances

of the present case the viewing of the robber at the time of the crime would have a more forceful effect in the selection of a photograph within a week thereafter than the brief viewing of a photograph would have upon an in-court identification made four months after the photograph was seen.[3]

The chances of accuracy would seem to be greater if the witness, asked if he could identify the robber from among a group of photographs within a week after the commission of a crime, should say, "That's the man who did it" than to say in court four months after he had last seen the photograph, "That's the man whose photograph I saw."

The evidence sufficiently supports a finding defendant was the robber, despite the testimony as to alibi, which is itself subject to question based upon the testimony of Mrs. Patton and Ellis. We note the coincidence that some of the papers taken in the commission of the crime were found within a few hours thereafter at 3285 B Street, not far from the home of Mrs. Patton at 3302 B Street.

The judgment is affirmed.

Brown (Gerald), P. J., and Coughlin, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 19, 1972.

---

[3]The trial commenced on January 13, 1971.

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.