**UNITED STATES of America,
Appellee,**

v.

**Jack Lesley MARSON, Appellant.**

**No. 11438.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 10, 1968.

Decided June 13, 1968.

Winter, Circuit Judge, dissented in part.

John Wesley Vardaman, Jr. (Court-appointed counsel), Washington, D. C., Stephen A. Weiswasser, Washington, D. C., on brief, for appellant.

Paul M. Rosenberg, Asst. U. S. Atty. (Stephen H. Sachs, U. S. Atty., on brief), for appellee.

Before BOREMAN, WINTER and BUTZNER, Circuit Judges.

BOREMAN, Circuit Judge:

On November 17, 1966, Jack Lesley Marson was convicted by a jury on two counts of an indictment charging him with the robbery of a federally insured bank. Although appointed counsel has carefully briefed and ably presented several issues, we find no error requiring reversal and, therefore, we affirm the conviction.

On March 4, 1966, a branch bank located in a suburb of Baltimore was robbed of approximately $18,000.00. According to the testimony of the bank employees, a lone male, undisguised and unmasked, entered the bank at about 1:00 P.M. and walked into the manager's office. There he pulled out a gun and a cloth bag or sack, of the type ordinarily used by banks and their customers, and ordered the manager to fill the bag with money from the tellers' cash

drawers. Obediently the manager entered the area behind the tellers' counter and proceeded to fill the sack with cash from each teller's position. He also placed some United States savings stamp albums in the bag. The robber remained on the customers' side of the counter, moving along in front of the manager as he proceeded to the several positions. Arriving finally at the opposite end of the counter, the manager handed him the bag and the robber departed.

A week later, on March 11, the United States attorney in Baltimore, having been advised of the results of a thorough investigation by the FBI, authorized the filing of a complaint against Marson charging him with the robbery. This information, the details of the investigation, and a description of Marson were relayed to the Louisville, Kentucky, FBI headquarters, and later that evening Marson was found and apprehended at the home of his father-in-law in a small community in Kentucky. Counsel was appointed for him and on April 4 he was afforded a preliminary hearing in Lexington. Shortly thereafter he was returned to Baltimore and held in jail.

■ In his brief, Marson argues that his arrest without a warrant was illegal and that certain evidence seized as a consequence of his arrest was improperly introduced against him at trial. However, we think the evidence developed during the investigation clearly was sufficient to give the Baltimore FBI agents probable cause within the meaning of the fourth amendment and reasonable grounds within the meaning of 18 U.S.C.A. § 3052 [1] to believe that Marson had committed the robbery.

Briefly, this evidence revealed that the bank bag and the savings stamp albums taken during the robbery were found by a lady in the alley behind her home in Baltimore a week after the robbery. They had been discarded there by her son who had discovered them in his car which he had lent to Marson during the time the robbery was committed. Both mother and son identified Marson as the person depicted in an artist's sketch prepared for the FBI from descriptions of the robber furnished by the bank employees. In light of this evidence we find no violation of Marson's fourth amendment rights.

■ Marson also argues that his arrest was illegal because of the officers' failure to comply with the provisions of 18 U.S.C.A. § 3109.[2] We find this argument is without merit and that substantial evidence in the record of the pre-trial hearing supports the trial court's ruling of legality. This evidence, although conflicting in some particulars, revealed that the entry by the officers at the front door of the home of Marson's father-in-law was peaceable and with no forcible breaking. It, therefore,

1. Section 3052 provides:
   Powers of Federal Bureau of Investigation.—The * * * agents of the Federal Bureau of Investigation of the Department of Justice may carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony.

2. Section 3109 provides:
   Breaking doors or windows for entry or exit.—The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

   While this section, by its terms, has reference to situations arising during the execution of a search warrant, the Supreme Court has held that an officer's entry to arrest without warrant must be tested by the criteria contained in this section. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

involved no violation of section 3109. *See* United States v. Conti, 361 F.2d 153 (2 Cir. 1966); Dickey v. United States, 332 F.2d 773 (9 Cir.), cert. denied, 379 U.S. 948, 85 S.Ct. 444, 13 L.Ed.2d 545 (1964). The witnesses apparently were in agreement that the entry at the front door preceded the entry of other officers into the kitchen. It is thus unnecessary to consider the evidence, much of it conflicting in its details, concerning the entry into the kitchen, as this entry, assuming it might have been improper, could not have invalidated the proper entry at the front door of the home. *See* United States v. Viale, 312 F.2d 595 (2 Cir. 1963); Cognetta v. United States, 313 F.2d 870 (9 Cir. 1963).

█ Since the arrest of Marson was legal, certain evidence found two days later by his father-in-law, Mr. Rose, is free of possible taint from an illegal arrest. It is clear that Mr. Rose cooperated in every way with the officers after learning of the robbery and voluntarily continued the search two days after the arrest. We thus find no error in the introduction of the evidence which had been turned over to the agents by Mr. Rose.[3]

The remaining questions presented on this appeal, to which counsel has devoted most of his efforts and emphasis, involve the propriety of Marson's courtroom identification by the bank's branch manager and four tellers, all of whom were eyewitnesses to the robbery. Discussion of these issues requires the recital of such further facts as are disclosed by the record.

Marson, as stated above, was afforded a preliminary hearing in Kentucky on April 4. Mr. Doyle, the bank's branch manager, was taken to Lexington to identify Marson. Sometime prior to the actual confrontation, Doyle was shown photographs of the defendant.[4] At the preliminary hearing and later at trial, Doyle positively identified Marson as the robber. The four bank tellers were not taken with Doyle to Lexington, but on April 15, two days after Marson was returned to Baltimore, photographs of him were shown to three of them, and all identified Marson as the robber.[5] The record is not complete with respect to the details of this identification, although it does contain copies of the photographs used. It is apparent that the tellers were shown three sets of standard "rogues' gallery" pictures, each set containing two or three views of the same person. The tellers were also shown two photographs of Marson in which he alone appeared. One of these resembled the close-up full-face view of the sort customarily used in the rogues' gallery pictures. The other, however, was a three-quarter length front view. There is nothing in the record to indicate the manner in which these photographs were displayed or even whether they were shown to the tellers assembled together or to each one individually. The record does reveal that the tellers knew at that time that the FBI had apprehended a suspect, but they did not know that Marson was the man, nor was his picture pointed out to them. Undisputed is the fact that neither Marson nor any attorney acting in his behalf

---

3. At the time of Marson's arrest the agents seized his handgun and several thousand dollars in cash. The Government had earlier agreed not to introduce this evidence and did not do so at trial, in spite of the favorable ruling by the trial court. The evidence discovered by Mr. Rose consisted of a camera case containing cash in the amount of approximately $14,000.00. Mr. Rose recalled that Marson and his wife had brought the case when they arrived from Baltimore. Some of this cash was identified as the bank's marked "bait money."

4. Details concerning this photographic identification are not ascertainable from the record.

5. Although all four of the tellers present during the robbery identified Marson at trial, the record contains the testimony of only three tellers concerning the pretrial photographic identifications. We do not know whether the fourth teller actually made such identification or whether there was an inadvertent failure to elicit testimony with respect thereto.

was informed of the pending photographic identifications.[6]

Marson's trial was scheduled to begin on November 15, some seven months after these identifications. As Marson had previously made several pre-trial motions which required the taking of evidence, a hearing was set for Monday, November 14, and those witnesses who were to testify thereat were subpoenaed to appear Monday morning. At the start of the hearing defense counsel requested that the witnesses be sequestered. The request was granted, and the hearing began. However, the presentation of testimony in connection with the pre-trial motions was not completed on Monday, and the hearing was continued over until Tuesday. As it had not been anticipated that the hearing would continue beyond Monday, the prospective jurors and those witnesses whose presence was not necessary at Monday's hearing had been summoned to appear Tuesday morning. These witnesses, including the four bank tellers who arrived at the appointed time, were seated at the rear of the courtroom when Marson, in the company of deputy marshals, entered the room. All four tellers saw him enter and immediately recognized him. Apparently a brief conversation took place among the tellers at that time as they commented to one another that the robber had just entered the room. Testimony indicated that Marson and the officers accompanying him were all clad in business suits and Marson's attire and general appearance did not differ from that of the officers except that he was not as tall as the others in the group.

As the prospective jurors had then arrived, the court decided to postpone the hearing of the pre-trial motions until after the selection of the jury. During the voir dire examination, Marson was called by name and was told to stand and face the jury. This was witnessed by the bank employees who were still seated in the courtroom. Shortly thereafter, their presence was called to the attention of the defendant's counsel who moved that they not be permitted to testify at trial as they had violated the sequestration order. The motion was denied by the trial judge who expressed his opinion that the order of the previous day had been prompted by the desire of defense counsel that the testimony of each of the witnesses testifying at the pre-trial proceedings be received out of the hearing of the others. Those witnesses, the court announced, were still excluded and "all other witnesses will now be excluded whenever the defendant asks that they be excluded." The court further suggested that defense counsel might cross-examine the bank employees concerning whether they saw the defendant when he stood and was identified for the prospective jurors. At trial, however, counsel for the Government inquired on direct examination as to when the witnesses had next seen the defendant after the robbery. All the tellers replied that they had seen him enter the courtroom Tuesday morning and had recognized him immediately. On cross-examination, the facts already set forth concerning the prior photographic identification were developed in an attempt to discredit the in-court identifications.

On these facts Marson presents three separate contentions as follows: (I) That he was deprived of his sixth amendment rights when, after he was in custody, the photographic identifications were procured without affording his counsel notice or opportunity to be present; (II) that he is entitled to a reversal of his conviction because the bank witnesses testified concerning what they had seen in court during the time they

6. As mentioned above, counsel was appointed for Marson in Kentucky prior to his preliminary hearing there. Trial counsel in Maryland was not appointed until May 6, several weeks subsequent to the photographic identifications by the tellers. Because of our view of the case, we find it unnecessary to consider what procedure concerning appointment and notification of counsel should have been followed under the circumstances.

were present in violation of the sequestration order; and, (III) that he was denied his liberty without due process of law by the Government's use of identifications at trial by witnesses to whom his photographs had been exhibited improperly and who had seen him under highly suggestive circumstances when they were present in violation of the court's sequestration order. We find no merit in these contentions.

## I

■ In support of his first contention Marson argues, in effect, that a photographic identification of a defendant during the accusatory stage of the proceedings is at a critical stage of the prosecution and he is, therefore, entitled to have his counsel present thereat just as he is now entitled to have counsel present at a personal identification at a "line-up." He cites United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). It is earnestly argued that *Wade* and *Gilbert* are not based upon the fact of physical confrontation alone and that the hazards and potential prejudice to an accused are just as great in the case of photographic identification as in a line-up identification, even though the accused himself is not present; that a photographic identification is to be equated with a line-up identification and that the same safeguarding rules and practices logically should be applicable to both; and, that the line-up identification procedure could have been followed in the instant case as readily as the method employed because Marson was in custody in Baltimore where the bank employees were available.

The Government insists that the rationale of *Wade* and *Gilbert* should not be extended to apply to the case at bar since one of the prime factors underlying those decisions was the presence of the accused during the identification process; that the danger that a witness who makes an unwitting misidentification later may be reluctant to change his mind or admit his error is less when photographs are used than when an actual line-up is employed. The Government argues further with great emphasis that, even if the *Wade* rationale is applicable to photographic identifications, the identification here assailed because of the absence of counsel was made prior to June 12, 1967, the effective date of *Wade* and *Gilbert* as fixed by the Court in Stovall v. Denno, 388 U. S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). [7] Thus, the argument goes, it would be anomalous, indeed, to extend to Marson the benefit of *Wade* when the Supreme Court has itself declined to extend the benefit of that decision to numerous prisoners who, like the defendant in *Gilbert,* were compelled to participate in a line-up without the benefit of the presence of counsel. Marson, both in anticipation of and in reply to this contention, argues that, while this court is compelled by the force of *Wade* and *Gilbert* to reach the result he desires, *Stovall,* which was concerned only with those cases, is not applicable here.

Prior to *Wade* there was decision law to the effect that the circumstances surrounding a pre-trial identification could be *so conducive to a misidentification* as to deny the accused due process of law. *See* Palmer v. Peyton, 359 F.2d 199 (4 Cir. 1966). But there was then nothing by way of suggestion or intimation that the right of an accused to the assistance of counsel might be extended to include the presence of counsel at a line-up or a photographic identification. *Wade* and *Gilbert* thus departed from and enlarged the former legal concept and *Stovall* made it clear that the change would be effective, prospectively only, from June 12, 1967. Even if we were to be persuaded to accept, without reservation, Marson's contention that photographic and line-up identifications are to be equated in all respects, we find

---

7. See also United States v. Quarles, 387 F.2d 551 (4 Cir. 1967).

ourselves in agreement with the Government's contention that the *Stovall* rule of prospective application is equally entitled to application in the circumstances of the present case.

## II

■■ We turn now to Marson's second contention with respect to the effect of the alleged violation of the sequestration order. Marson admits that a trial judge may exercise his discretion in permitting a witness to testify at trial when the witness had earlier been present in court contrary to the judge's order. This, of course, is a correct statement of the law. *See, e.g.,* Holder v. United States, 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010 (1893); United States v. Leggett, 326 F.2d 613 (4 Cir. 1964); United States v. Johnson, 345 F.2d 457 (6 Cir.), cert. denied, 382 U.S. 836, 86 S.Ct. 83, 15 L.Ed.2d 79 (1965); Spindler v. United States, 336 F.2d 678 (9 Cir. 1964), cert. denied, Richards v. United States, 380 U.S. 909, 85 S.Ct. 894, 13 L.Ed.2d 797 (1965). Ordinarily the issue before this court would be whether the trial judge abused his discretion in permitting the bank employees to testify under these circumstances. But in this case we are faced with the preliminary question—whether there was in fact any violation of the order. We are unable to accept defendant's statement that "it is undisputed that the Government's witnesses violated the order of sequestration."

When the presence of the bank employees was brought to his attention the judge offered to exclude them and all other witnesses if and when the defendant should so request. Counsel for the defendant may have thought he had requested that *all* witnesses be excluded throughout the entire proceedings, but a careful examination of the record convinces us that the judge intended that the sequestration order should apply only to the witnesses to be heard in connection with the pre-trial motions.

In any event, it is the thrust of Marson's argument that he was prejudiced when he was seen by the bank witnesses at the same time he was called by name and identified by the court as the defendant. However, the attorney for the Government elicited clear testimony from the teller witnesses on direct examination that they had seen Marson earlier when he entered the courtroom and had immediately recognized him among the small group of men who entered at the same time. Similar testimony was elicited under cross-examination. Under these circumstances, there is no clear indication of prejudice to the defendant from a violation of the sequestration order, even assuming such violation.

## III

■■ Finally, Marson contends that as a matter of law his identifications at trial by the bank witnesses were so tainted by the two improper pre-trial identifications as to constitute a denial of due process. To sustain this argument Marson must establish in effect that his two pre-trial identifications were "unnecessarily suggestive and conducive to irreparable mistaken identity." Such a claim must be evaluated in light of the totality of surrounding circumstances. See Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (U.S. March 18, 1968). See also Palmer v. Peyton, 359 F.2d 199 (4 Cir. 1966).

We note first that, as in *Simmons, supra,* the circumstances of the robbery itself were such as to minimize the chance of misidentification. Here the robber was neither masked nor disguised. He stood in front of each teller at a distance of only four or five feet. Only a bank counter of normal height separated the tellers from the customers' area where Marson stood and there was nothing in the nature of bars, cages or screens which could obstruct the tellers' view of the robber. Mr. Doyle's opportunity for observation was even greater

as he saw the robber for a slightly longer time and probably at a closer range. Also we note that the recollections of the five bank employees and their verbal descriptions were so accurate that two people who did not witness the robbery identified Marson as the subject of the FBI sketch prepared from information furnished by these bank witnesses.

It is true that the record is incomplete respecting the details of the photographic identifications. There is nothing to indicate the circumstances under which photographs were shown to Doyle prior to his corporeal identification of Marson at the Kentucky hearing, and relatively little is disclosed as to the facts surrounding the showing of the photographs to the other bank employees. The selection of photographs to be exhibited to the bank tellers may not have been ideal, but there is no showing that FBI agents suggested to the tellers which man in the pictures was under suspicion. Finally, the photographic identifications by the tellers occurred only some six weeks after the robbery, and the trial itself was some months later. No situation is present here where an identification by photographs is made shortly before trial but long after the commission of the crime which might tend to increase the chance that the photographs would be more vivid in the witnesses' minds than their recollection of the robber during the commission of the crime. We conclude that the photographic identifications were not made under circumstances or conditions tending to taint the identifications at trial.

We reach the same conclusion concerning the pre-trial identifications in the courtroom. Marson was not wearing handcuffs or unusual garb and the officers were not wearing badges or uniforms. There was nothing, except an alleged difference in height, to attract special attention to Marson as he entered. Each teller apparently noticed and recognized him at once, and the record will not fairly support an inference that their separate identifications followed the brief conversation among them so that some of them might have been influenced by the remarks of the others.

We are not persuaded that the combined impact of these two pre-trial identifications upon the recollections of the witnesses and their identifications of Marson at trial amounted to a denial or deprivation of due process. Each bank witness gave unhesitating and convincing testimony at trial that Marson was the man who had robbed the bank.

Perceiving no error, the judgment below is

Affirmed.

WINTER, Circuit Judge (concurring in part and dissenting in part):

While I agree with the Court's disposition of defendant's contention concerning the legality of his arrest and the seizure of certain evidence, and the alleged violation of the sequestration order, I am constrained to dissent from its conclusion that Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), renders United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), inapplicable to this case. I would hold them both applicable, and I would remand this case for further proceedings on their authority. I would not at this point reach the question of whether the totality of circumstances surrounding the identification denied defendant's rights under the due process clause, as enunciated in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967), and Stovall v. Denno, *supra*. See also, United States v. Quarles, 387 F.2d 551 (4 Cir. 1967).

The operative facts described in the majority opinion may be briefly summarized: Defendant was charged in Baltimore, Maryland, and arrested in Louisville, Kentucky, on March 11, 1966. Counsel was appointed for him in Lexington; a preliminary hearing was held in Lexington on April 4; and he was

thereafter returned to Baltimore, where he was held in custody. Preceding the April 4 hearing, while defendant was in custody and while he had counsel, the witness Doyle was shown photographs, in Baltimore, of the defendant by the FBI.[1] Doyle testified that he had these photographs, as well as the sketch which he was also again shown, "in mind" when he went to Lexington.

On April 15, 1966, after defendant had been returned to Baltimore, while he was in jail and before counsel had been appointed to represent him in Baltimore, the F.B.I. showed photographs of defendant and other individuals to four tellers who had witnessed the robbery. All of the pictures, except those of defendant, were typical "mug-shots;" those of defendant were typical snapshots. All pictures were admitted into evidence.

Defendant's Kentucky counsel was not given notice that the F.B.I. intended to display photographs for the purpose of obtaining an identification of defendant to Doyle or the bank tellers, or given an opportunity to be present or to arrange for associate counsel. Doyle and four tellers testified at defendant's trial and identified him as the person who committed the crime charged. Doyle and three of the tellers also testified, on cross-examination, that they had identi-

fied him from photographs shown to them before trial. Other details concerning the identification from photographs were not developed at the trial.

*Wade* and *Gilbert* both decided that the Sixth Amendment right of an accused to counsel attached when he was in custody after indictment, and when his person was exhibited in a lineup for purposes of identification. Stated otherwise, denial of the right to counsel at a police lineup, absent waiver of the right, was held to render inadmissible the in-court identification of a witness who had identified the accused at the lineup. Of course, the *Simmons* case, decided the next term, held that an identification which occurred *before* an accused was in custody, and which, incidentally, was made from photographs, was a circumstance to be considered as part of the totality of surrounding circumstances to determine if due process rights had been violated.[2]

*Wade* and *Gilbert* both announced a new rule of constitutional law. The rule was predicated upon considerations of fairness and the possibility that risks of suggestion, direct or indirect, could be made by police officers to witnesses,[3] as well as the difficulty of reconstructing later at trial exactly what was said and done at the identification procedure, so

---

1. Doyle was also shown a sketch of the alleged perpetrator of the crime. The sketch had been prepared, prior to the time that defendant was taken into custody, from descriptions furnished by Doyle and other bank employees. Since the initial exposure of Doyle and the other bank employees, who testified at the trial, to the picture was prior to defendant's being taken into custody, the sketch, for reasons set forth *infra* in the text, need not be further considered.

2. The opinion of the Court expressly set forth that Simmons asserted no Sixth Amendment right. "Simmons * * * does not contend that he was entitled to counsel at the time the pictures were shown to the witnesses." *Id.*, 390 U.S., p. 383, 88 S.Ct., p. 970.

3. "[T]he confrontation compelled by the State between the accused and the victim

or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. * * * A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. * * * Suggestion can be created intentionally or unintentionally in many subtle ways. * * * Lineups * * * present a particular hazard that a victim's understandable outrage may excite vengeful or spiteful motives. * * * neither witnesses nor lineup participants are apt to be alert for conditions prejudicial to the suspect." United States v. Wade, *supra*, 388 U.S., pp. 228–231, 87 S.Ct., p. 1933.

that the fairness and accuracy of the identification could be determined.[4] Because of the grave potential for prejudice, intentional or not, which may not be capable of reconstruction at trial, and since the presence of counsel itself can often avert prejudice and assure a "meaningful confrontation" at trial, the Court laid down the rule that, unless effectively waived, the presence of counsel at the lineup was the *sine qua non* to permitting a witness to make an in-court identification when the identification was based upon a previous lineup.

I cannot read *Wade* and *Gilbert* to express considerations substantially less applicable to identification by the exhibition of photographs than to identification by exhibition of the person. It is true that if the photographs shown to a witness who makes an identification are preserved, what the witness saw in making an identification can be later demonstrated in court. It is true, also, that the use of photographs eliminates or diminishes some potential unfairness present in the use of a lineup, such as using persons who have marked differences in height. Yet, photographs present other dangers, one of which is present in this case, of a markedly different pose of the defendant from the poses of other individuals whose photographs are exhibited, which may have the effect of placing greater emphasis on the photograph of

the defendant, because of its uniqueness, than on the others. With the use of photographs, many of the potential dangers present at a lineup where counsel is absent are also present. Aside from direct prejudicial oral communications between police officers and a witness asked to make an identification, an unscrupulous police officer, or even a scrupulous police officer, unwittingly, may influence the identification by the manner in which the photographs are spread out, or the order in which they are handed to the witness—in short, by any of the myriad forms of suggestion possible in the context of an *in camera* identification.

To my mind, the slight diminution of possible prejudice by the use of photographs is about equal to the additional possibilities for suggestion, direct or indirect, intentional or unintentional, in the use of photographs, so that I would hold the doctrine announced in *Wade* and *Gilbert* applicable to identification by photograph when the identification occurs after the accused is in custody.[5] Although *Wade* and *Gilbert* were decided in the context of a post-indictment lineup and the opinion in *Wade* speaks of a post-indictment lineup, I see no reason to differentiate between post-indictment and other post-custody identifications. After a defendant is in custody, the incentive to the police by intentional or

4. "What facts have been disclosed in specific cases about the conduct of pretrial confrontations for identification illustrate both the potential for substantial prejudice to the accused at that stage and the need for its revelation at trial." United States v. Wade, *supra*, p. 232, 87 S.Ct., p. 1935. "Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the post-indictment lineup was a critical stage of the prosecution at which he was 'as much entitled to such aid [of counsel] * * * as to the trial itself.'" *Id.*, p. 236, 87 S.Ct., p. 1937.

5. I would reject the government's argument that defendant's failure to object to the identification testimony forecloses his pressing this conclusion on appeal. *Wade* and *Gilbert* had not been decided when defendant's trial was held. I deem this case within the "plain errors or defects affecting substantial rights" provisions of Rule 52, F.R.Crim.P. "Appellate courts often notice error not objected to below when, under the law existing at the time of the trial, objection would have been futile and when error was asserted on review on the basis of a subsequent appellate decision." United States v. Indiviglio, 352 F.2d 276, 280 n. 7 (2 Cir. 1965).

unintentional influence to etablish that the correct defendant has been apprehended and the crime has been correctly solved is equally great whether there has been time for the return of an indictment.

Whether one disagrees with *Wade* and *Gilbert* or willingly embraces their doctrine, I am of the view that an identification properly conducted and arrived at by confrontation with the person identified carries with it a higher degree of accuracy than an identification based solely upon the examination of photographs. To hold that a post-custody identification by resort to photographs without counsel, absent the waiver of counsel is constitutionally permissible would be to invite law enforcement officers to avoid the presence of counsel by resort to identification by photographs. This would be an unfortunate consequence of declining to extend *Wade* and *Gilbert,* because the quest for the ultimate truth, the basic purpose of a criminal trial, would be relegated to secondary sources.

*Stovall,* to my mind, is no answer to defendant's contention in this case; it appears to me to be only a convenient device to avoid an issue that the Court should squarely face. It is true that the *Stovall* case held that only the defendants Wade .and Gilbert, and other defendants identified by means of a lineup after June 12, 1967, the date on which *Wade* and *Gilbert* were decided, should have the benefit of the rule set forth in those cases. The reasons for allowing Wade and Gilbert to have the benefit of the decisions were that under the Constitution courts decide concrete cases and do not pass upon constitutional questions as mere dictum, and counsel must be given the incentive to advance contentions re-

quiring a change in the law. *Id.,* 388 U.S. 301, 87 S.Ct. 1967. Because I am of the view that the rule of *Wade* and *Gilbert* should extend to identifications by photograph, I am led to the conclusion that defendant should be the beneficiary of this new adjudication, (a) because I should not express my view as dictum, and (b) because the diligence and astuteness of defendant's counsel to advance a constitutional contention, not obvious on its face and not a simple application of *Wade* and *Gilbert,* should be recognized so as to promote similar commendable conduct on the part of other members of the bar. Presumably, in the light of the *Stovall* decision, if my views on the disposition of the case at bar were to prevail, they could not be availed of by any other defendants whose trials began any earlier than the date of this decision. Certainly, they could not be availed of by persons whose convictions had become final before the date of decision and who sought to assert them in applications for post-conviction relief.

A word must be said as to the form of relief to which I think the defendant is entitled. In *Wade* the conviction was vacated and the case remanded to the district court for hearing and a determination of whether the in-court identification had an independent source, or whether the introduction of the evidence was harmless error. The authority of the district court to reinstate the conviction or order a new trial, as may be proper after development of the record, was recognized. Similar relief was granted in Gilbert.[6] Since the record in this case, understandably because it was made before the decision in *Wade* and *Gilbert,* leaves unanswered so many aspects of the photographic identification

---

6. It should be noted in *Gilbert* that the testimony of the bank manager who testified at the trial that he had identified Gilbert at the lineup was held not susceptible of the *Wade* type inquiry and *per se* was excludable. A close reading of *Wade* discloses similar testimony on cross-examination but different relief pre-

scribed. Although not absolutely clear, the difference would appear to be that in *Gilbert* the testimony in question was given on direct examination. In the case at bar, the testimony was given on cross-examination or on redirect after the subject had been introduced on cross.

and its bearing, if any, on the in-court identifications, I would vacate defendant's conviction and remand the case with the same direction and same recognition of the district court's authority on remand as those given in *Wade*.