**Gene Wayne GARRETT and Charles Leonard Brank, Petitioners,**

v.

**V. Lee BOUNDS and State of North Carolina, Respondents.**

**Civ. A. No. 2636.**

United States District Court, W. D. North Carolina, Charlotte Division.

June 18, 1971.

---

7. See Regulation § 405.191(b) (2), 34 F.R. 11208.

George S. Daly, Jr., Charlotte, N. C., for petitioners.

Robert Morgan, Atty. Gen. and Jacob L. Safron, Asst. Atty. Gen., State of N. C., Raleigh, N. C., for respondents.

## MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

Petitioners, Gene Wayne Garrett and Charles Leonard Brank, are presently detained in North Carolina Central Prison in Raleigh serving sentences of twenty-five (25) to thirty (30) years for armed robbery imposed at the February 3, 1969, Schedule "D" Criminal Session of the Superior Court of Mecklenburg County upon their convictions by a jury. Petitioners duly appealed their convictions to the North Carolina Court of Appeals where their convictions were affirmed, State v. Garrett and Brank, 5 N.C.App. 367, 168 S.E.2d 479 (1969). Petitioners thereupon petitioned the North Carolina Supreme Court for a writ of certiorari which was denied, State v. Garrett and Brank, 276 N.C. 85 (1970). On January 20, 1970, petitioners filed a petition for post-conviction hearing in Mecklenburg County Superior Court pursuant to N.C.G.S., §§ 15–217 to 15–222. This request for a post-conviction hearing was denied. Thereupon, the petitioners presented a petition for a writ of certiorari to the North Carolina Court of Appeals which was denied on February 24, 1970. Garrett and Brank now petition this court for a writ of habeas corpus, alleging the following as grounds for relief:

(1) That certain pretrial identification of the petitioner Garrett was improper;

(2) That a key witness for the prosecution, Jimmie Rogers, was intimidated at petitioners' trial when a bench warrant for perjury was served on him during testimony;

(3) That the petitioners were denied representation of counsel at a "critical stage" of the prosecution against them;

(4) That the examination by the trial judge of certain documents at petitioners' trial in the presence of the jury and his subsequent conduct violated due process of law; and

(5) That petitioners were denied a fair trial by certain publicity during the trial.

On November 30, 1970, a hearing was conducted in the United States District Court in Charlotte to consider petitioners' claims. Upon consideration of the evidence presented at that hearing and the applicable law, the court's findings of fact and conclusions of law follow.

ALLEGATION ONE: Petitioner Garrett claims that he was subjected to an illegal pretrial identification. The facts are that on July 24, 1968, two men armed with firearms held up and robbed several participants and spectators at a poker game at the Moose Lodge in Charlotte, North Carolina. James Van Lewis was apparently a victim of the robbery. He was interviewed several times by telephone by Charlotte Detective Sergeant G. L. Painter. Painter visited him before, at, and after a line-up of various suspects on September 13, 1968. There is no indication that Lewis identified anyone from photographs before the line-up. At the line-up on September 13, 1968, he said "I think" one of the robbers was No. 2 man in the line-up (Garrett was the No. 2 man). The witness William McMillan failed to identify anyone at the line-up, but several days later upon viewing photographs of Garrett and of the line-up identified Garrett as one of the robbers.

No one appears to have identified the petitioner Brank before, during or after the line-up except the witness Rogers, whose testimony appears later, and the witness A. C. Warren, whose identification was based on his having "glanced" at Brank for a few seconds during the robbery.

At the line-up and at the trial, Attorney James H. Morton represented the defendant Gene Wayne Garrett. At the line-up Attorney Reginald Hamel represented the defendant Brank and at the trial Mr. Brank was represented by Attorney Arthur Goodman.

The demonstration of the photographs to the various witnesses before and after the line-up was done without any counsel present.

The court is squarely faced with the question whether the right to counsel in a post-indictment line-up, guaranteed to an accused in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), applies equally to post-arrest *photographic* identifications. In United States v. Marson, 408 F.2d 644 (4th Cir., 1968), and United States v. Collins, 416 F.2d 696 (4th Cir., 1969), the Fourth Circuit, addressing itself to the essential question, concluded that *Wade* does not extend to post-arrest photographic identification. Judge Winter dissented in both *Marson* and *Collins*, reasoning that the "myriad forms of suggestion" possible in a line-up were equally likely (if not more likely) to occur in post-arrest photographic identification. *Marson, supra,* 408 F.2d at 653–654. See also, United States v. Zeiler, 427 F.2d 1305 (3rd Cir., 1970), in which the Third Circuit Court of Appeals held that the *Wade* rationale did apply to pre-trial photographic identification of an accused in custody.

■■ If this question were one of initial instance, this court would be inclined to follow the dissenting views of Judge Winter in *Collins* and *Marson*.

However, the Fourth Circuit has twice spoken clearly on this issue (four different Circuit Judges were in the majority in the two cases: Judges Boreman and Butzner in *Marson* and Judges Bryan and Haynsworth in *Collins*), and, as an inferior court, this court is constrained to follow the Court of Appeals' position as set out in *Marson* and *Collins*.

ALLEGATIONS TWO, THREE, FOUR AND FIVE: The court's findings based upon evidence at the November 30, 1970 hearing with respect to petitioners' other contentions follow.

### FACTS

Jimmie Rogers, of Greer, South Carolina, was the key prosecution witness.

Police Detective Painter interviewed Rogers at Greer, South Carolina, on or before September 19, 1968, in the office of Rogers' attorney, John Rollins.

No written statement was obtained from Rogers, and no statement was signed by him then or later.

Rogers was not asked to write nor to sign a statement.

Upon returning from the interview, Painter prepared a typed memorandum of the contents of his interview with Rogers. This memorandum was Plaintiff's Exhibit 16. The memorandum quotes Rogers as saying that he and one Marlowe DeYoung and one David Rowland (alias "Hog") had been in company with Garrett and Brank early on the night of the robbery, July 23, 1968. They got together in the neighborhood of Greer or Greenville, South Carolina. Brank proposed that they go rob the Moose Lodge in Charlotte. Garrett agreed to go. Garrett and Brank drove to Charlotte in Brank's car and Rogers, Marlowe and "Hog" drove in "Hog's" car. When they reached the Moose Lodge parking lot Rogers, Marlowe and "Hog," seeing Brank was serious, left the scene and drove away leaving Brank and Garrett in Charlotte. The memorandum also quoted Rogers as saying that Brank told him a few days later that they *had* robbed the Moose Lodge.

The statement was never shown to the witness Rogers until the time of trial. It was delivered to the solicitor, Mr. Edmund Liles, as a part of the investigating officers' file.

The testimony of the witness Rogers covers forty pages of the record of the trial. Mr. Painter, the detective, had not yet testified. On direct examination by the prosecuting attorney, Rogers testified that he knew the petitioners and had been with them on the night of the crime and that Rogers, Marlowe and "Hog" had drive to Charlotte where they became separated without Garrett and Brank ever getting out of the car. He denied having gotten near the Moose Lodge. He denied having given a signed statement to Detective Painter but did admit having talked with Detective Painter.

The direct examination and cross-examination of the witness took place without reference to any "statement" except that the witness remembered having talked with Detective Painter.

The only questions by the prosecuting attorney on re-direct examination about the Painter conversation were the following brief questions and answers:

"Q. Mr. Rogers, I will ask you if you ever gave Detective Painter a written statement concerning what you just testified to?

"A. Not a signed statement, no, sir.

"Q. Did you give him some information in the office of Mr. Rollins, an attorney in Greer?

"A. I talked to him in front of Mr. Rollins, yes, sir."

The solicitor, Mr. Liles, finished his brief re-direct examination and said to the witness, "Come down."

At that point a most extraordinary drama began. The presiding judge said

to the solicitor, "Mr. Liles, may I see your file?" The solicitor handed him the police file, including Painter's memorandum, Exhibit 16, and the judge sat in the presence of the jury reading the memorandum and looking at the rest of the file for a period of several minutes. The judge then said:

"Sheriff, take the Jury to the Jury Room. Members of the Jury, if you will step out for a few minutes, please, we will send for you a little later. Sheriff, after you take the Jury to the Jury Room, come back to the Courtroom."

### JURY RETURNED TO JURY ROOM.

"Sheriff, take this witness into custody and I want a bench warrant issued against this witness for signature this afternoon for perjury."

When the jury returned to the courtroom the witness Rogers was absent and the witness DeYoung was called. The court was recessed apparently about fifteen minutes early (T. p. 100).

A bench warrant was issued by the presiding judge for the arrest of the witness Rogers for perjury. Before the jury were sent home, the court gave them the customary instructions not to read newspapers, not to read nor listen to newspaper, television or radio stories, nor to discuss the case.

The story of the witness's arrest and the perjury warrant was carried prominently on the front page of the second section of THE CHARLOTTE OBSERVER for the following morning. The story included a statement made by the prosecuting attorney to or in the presence of the newspaper reporter to the effect that the testimony of the witness Rogers was "substantially different" from his previous unsigned statement to the police.

The witness Rogers was released on bond, went to South Carolina, got his lawyer, came back and saw the judge and the solicitor and Detective Painter before court opened the following morning. Rogers' attorney, Mr. Rollins, told the judge that Rogers now wanted to report the "true facts" and the judge said that he would give him an opportunity to do so.

[Mr. Goodman, counsel representing the defendant Brank, was not present at this conference and did not know it had taken place until the hearing of this habeas corpus motion on Monday, November 30, 1970! While the judge was conferring with Rogers and the solicitor, and up until the time court opened, Goodman was working in the law library checking the legal authorities on the prejudicial nature of the ostentatious arrest of a material witness for perjury.]

When court opened the judge excused the jury and ordered both defendants taken into custody and held without bond. The court also, with the conference with the witness Rogers now concluded, announced that the state would be allowed to recall the witness Rogers for further testimony.

The defendants moved for mistrial based upon (1) the manner in which the court had examined the prosecution's file in the presence of the jury; (2) the issuance of the bench warrant; (3) the newspaper publicity [which it turns out was in part based on out of court statements of the prosecuting attorney]; and (4) the prejudicial effect that the story might have upon the sequestered witnesses.

The court called the jury back and inquired whether any of the jurors had read the newspaper story. One juror said, "Your Honor, I just looked at the headline of the article and passed it over." The complete colloquy between court and juror is as follows:

"COURT: Members of the Jury, this Court will direct some questions to

the entire panel. If it applies to you, I am instructing you to raise your hand. Did either of you this morning read any article or any portion of an article appearing in the *Charlotte Observer* pertaining to the matter now on trial? If you did, please raise your hand.

"JUROR: Your Honor, I just looked at the headline of the article and passed it over.

"COURT: The fact that you looked at the headlines, from that did you form or express any opinion about the case?

"JUROR: No, sir.

"COURT: Would that in any way enter into your ultimately reaching a verdict in the case based solely on the evidence as it came from the witness stand and the argument and contentions of counsel and the instructions given you by the Court?

"JUROR: It would not affect me in any way.

"COURT: Anyone else?"

No inquiry was made as to whether any of the jurors had gotten information about the incident from other sources such as radio or television or word of mouth. No investigation was made into the effect upon the jury of what had happened in the courtroom.

Copy of the story as it appeared on the front page of the second section of THE CHARLOTTE OBSERVER is appended to this order.

All defense motions were overruled.

The state then recalled the witness Jimmie Rogers, who under these revised sanctions dutifully repeated his story essentially as it had been covered in Officer Painter's unsigned memorandum of September 19, 1968.

The only other identification of Brank as being on the Moose Lodge premises

that night was the testimony of the witness A. C. Warren (T. p. 64, et seq.), who said that he saw Brank briefly appear in the doorway with a shotgun and pistol; that he "just glanced" (T. p. 71) at Brank and that he was turned looking the other way for practically all of the rest of the twenty minutes that the robbery required, and that it was "only a matter of seconds" that he looked at Brank.

The perjury charge against the witness Rogers was "nol prossed" or discontinued by the prosecution after the trial of the petitioners had been completed!

## CONCLUSIONS OF LAW

 Regardless of the probable guilt of the petitioners, the actions of the court and the prosecution as outlined above can only have made a fair trial extremely difficult if not impossible, and in the aggregate can reasonably be found to have adversely affected the fairness of the trial. The behavior and bearing of a judge during a jury trial should be such that the trial is conducted in an impartial atmosphere. United States v. Cassiagnol, 420 F.2d 868 (4th Cir., 1970); United States v. Ornstein, 355 F.2d 222 (6th Cir., 1966). "[J]urors are ever watchful of the words that fall from [the trial judge]." United States v. Tobin, 426 F.2d 1279, 1282 (7th Cir., 1970). Procedural due process is contemplated under the Bill of Rights. Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). The fairness of the trial is in grave question. The *nol pros*, or the discontinuance of the perjury charge against the state's witness after the defendants were convicted, came too late to remove the influence of the charge upon the jury or to improve the fairness of the trial, and serves simply to emphasize the obvious weakness of the perjury case against the witness.

APPENDIX

DEFENDANT'S EXHIBIT Counsel 1

*Local News*

## The Charlott:

FOUNDED 1886

# $656,047 Repairs Area Fund Budget

**By MARSHA CANFIELD**

*Observer Staff Writer*

The Charlotte antipoverty agency will get most of the federal money it had requested for the current year.

The announcement Monday of a $656,047 grant from the Office of Economic Opportunity came shortly after the Charlotte Area Fund had started machinery for a bank loan to shore up its sagging surplus.

CAF funds, normally released in October, were held up because the agency's application was several months late. Surplus funds used since October to meet expenses of the central office and its delegate agencies would last through this month, CAF officials said.

CAF Director Robert Person Jr. said that he had not gotten detailed information from OEO by Monday night.

"It appears, though, that there was no substantial cut and the figure is about what we had last year," Person said.

The OEO set aside $488,378 in new federal money, with $167,699 from surplus federal funds for the year ending in September.

The federal funds, combined with $200,940 worth of local cash or services, gives the CAF an operating budget of $856,017.

Person said the CAF had requested a total of $974,820, including local matching money.

However, about $125,000 requested for legal services normally is not included in the total grant but is separate, making the total about what the CAF had applied for, Person said.

Four to six weeks are usually required before the money clears the red tape and is available for spending. Person had estimated the surplus might run out by then.

"I feel fairly certain the OEO recognizes our problem and it will not be necessary to acquire a bank loan," he said.

Person added that he would not know of stipulations or changes requested along with the grants until OEO officially notified the agency.

He said OEO officials had told him there would be few special conditions attached to the refunding.

In its budget request, the CAF asked for $141,568 for administration, $336,042 for neighborhood service centers and community development; $35,974 for family and children's services; $87,668 for homemaking education; $103,668 for Opportunity Industrialization Center; and $141,761 for the Charlotte Bureau of Employment Training and Placement. Another $125,139 was budgeted for legal services.

Central Pie

## N.C. Centr

## 'Fri Sco

## Witness Held As Poker-Theft Trial Kicks Off

**By NANCY BRACHEY**

*Observer Staff Writer*

A state witness was held on a perjury charge following his testimony Monday concerning a robbery that left 15 poker players cashless and trouserless.

The perjury charge came on the first day of the trial of two Greer, S.C., men accused of holding up some Moose Lodge 115 members last summer.

The witness, Jimmy Rogers, 21, of Greer, S.C., was held under $5,000 bond on a bench warrant issued by Superior Court Judge Lacy H. Thornburg.

Assistant Superior Court Solicitor Edmund A. Liles said Rogers' testimony Monday was "substantially different" from an unsigned statement he gave to police investigating the $5,691 robbery.

Rogers was one of several witnesses called to testify in the state's case against Gene Wayne Garrett, 25, and Charles Leonard Brank, 28, both of Greer, S.C.

Each man is being tried on five counts of armed robbery, although they have each been indicted for 14 counts of armed robbery and one count of conspiracy to commit armed robbery.

William McMillan of Monroe, assistant manager of the Moose Lodge at 119 E. Fifth St., identified Garrett as the man he saw standing in a lodge doorway with a shotgun.

McMillan said the man told the poker players, "Everybody keep their hands on the table."

"Which I did," McMillan said.

McMillan said Garrett also ordered the men to take off their pants.

"Which we did," he continued.

The trousers were gathered and placed in a laundry-type bag, and money was also taken from the lodge cash register, McMillan testified.

McMillan said he was frightened by the bandits. He said other card players were so frightened they took off more than their trousers.

Another card player, A. C. Warren, testified that Brank was the other man who robbed the men and the lodge. Warren said he lost $10 and his pants in the robbery.

[A4201]

**By PAUL CLANCY**

*Observer Staff Writer*

The conciliation division of the Mayor's Community Relations Committee has resolved 12 of 14 complaints to date, and the remaining two are being negotiated.

By using friendly persuasion, the division, an arm of city government, has been able to bring about voluntary compliance with the local public accommodations law in every case it has handled, the division reported Monday.

The new chairman of the division, A. Eugene Warren, said in a report to the City Council that there have been 14 sworn complaints alleging discrimination since the ordinance