Eugene A. HOGAN

v.

E. L. PADERICK, Sup't., etc.

Civ. A. No. 74–0070–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 6, 1975.

Robert P. Geary, Greene & Poindexter, Inc., Richmond, Va., for plaintiff.

Gilbert W. Haith, Asst. Atty. Gen. of Va., Richmond, Va., for defendant.

### MEMORANDUM

MERHIGE, District Judge.

Eugene Audry (Autry) Hogan, a Virginia prisoner, seeks reversal of state court convictions for second degree murder and malicious wounding on the ground that they were based upon an in court identification that had been earlier infected by an impermissibly suggestive photo identification. *See Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Jurisdiction is conferred by 28 U.S.C. §§ 2241 and 2254. Petitioner has exhausted his state court remedies. This matter comes before the Court on respondent's motion for summary judgment and petitioner's cross motion for summary judgment. After having considered the pleadings, briefs, and state court records, and after having heard oral argument, the Court deems this matter ripe for disposition.

### I.

During the night of May 1, 1970, or the early morning hours of May 2, Fannie Harriman, an elderly night clerk at the Jackson Motel in Pulaski, Virginia, was the victim of a robbery-murder. Herbert Harriman, her husband, was also robbed, shot twice in the head with a .22 caliber weapon, and left for dead. Although seriously injured, Herbert Harriman survived the shooting and subsequently identified petitioner from a photo array as the perpetrator of the crimes. On the basis of Herbert Harriman's in court identification, petitioner was convicted by a jury in the Circuit Court of Pulaski County, of the murder in the second degree of Fannie

Harriman on December 16, 1970.[1] Again on the basis of Herbert Harriman's in court identification, petitioner was convicted in the Pulaski County Circuit Court in May, 1971, of the malicious wounding of Herbert Harriman by a jury drawn from Carrol County.[2]

At the December and May trials, the Commonwealth proved the following: Fannie Harriman worked as a desk clerk during the 11:00 p. m.—7:00 a. m. night shift at the Jackson Motel. Her husband, Herbert Harriman, who always accompanied her, would sleep on a couch in a back room and would spell his wife at the desk at intervals during the night. The Harrimans would normally relieve Mrs. Fred Jackson, the owner of the motel, who worked at the desk on the preceding shift.

The Harrimans arrived at the Jackson Motel at 10:30 p. m. on May 1, to prepare for the night shift. About five minutes after the Harrimans arrived, a white male, later identified as Ernest Bayne Davis, got out of a cab and entered the motel office. Davis rented a room for one night in the name of George Davis. Mrs. Jackson testified that he wore very tight fitting pants which revealed the imprint of a gun in his left pocket and a tubular bottle, about the size of an alka seltzer bottle, in the other pocket. When Davis left the office, he signaled to some people who were waiting upon a bridge above the motel. Davis was joined in his motel room by a black female, Betty Jo Morris, and a black male carrying a case of beer, later identified as petitioner. Mrs. Jackson testified that she saw Hogan leave the motel room approximately five minutes later and enter a public telephone booth where he made a call. She turned the desk duties over to the Harrimans at 11:00 and left the motel at 11:17 p. m.

Herbert Harriman testified to the following: He did not see Davis regis-

ter; nor did he see Hogan and Morris enter Davis' room. Shortly after Mrs. Jackson had left for the night, however, Hogan entered the office brandishing a gun and ordered Fannie Harriman to give him her money. She gave him the motel money which was kept in a desk drawer and her own money which she kept in a zippered change purse. When Hogan demanded his money also, Harriman gave him all the money that he had on his person. After further prompting, Harriman also gave Hogan some money that he had hidden behind a stereo set. Hogan next forced the Harrimans into a utility room and told Fannie Harriman that he was going to rape her. When Herbert Harriman sprang to his wife's defense, Hogan, after a brief struggle, shot him twice in the head and then shot Mrs. Harriman dead. Harriman passed out but later came to when he felt a painful burning sensation in one hand which was caused, he testified, by Hogan's placing his hand into a cup of hot coffee. Harriman also noted that Hogan had been joined by Davis and Betty Jo Morris and that all three were drunk. Harriman again lost consciousness and he was found the next day along with his murdered wife by their daughter who drove to the motel when her parents did not return home at 7:30 a. m., as was their custom. Fannie Harriman's purse was recovered subsequently beneath a pigment processing vat at the Hercules Pigment Plant in Pulaski, Hogan's place of employ. The vat normally contained an acid solution which was used to reduce metal during a stage of the pigment manufacturing process. Since the purse had been thrown into the vat at a point in the process when the acid solution had weakened considerably, it had not decomposed and had filtered out of the vat virtually intact.

Hogan testified at both trials and produced a strong alibi defense. He,

---

1. Two previous trials on the murder charge had each ended in a hung jury and a declaration of a mistrial.

2. There had been an earlier mistrial on the malicious wounding charge.

Davis and Morris, so he testified, had been drinking at the Doo-Drop-Inn at Pulaski from approximately 8:00 to 10:00 p. m. that evening. Davis and Morris asked him to accompany them to the Jackson Motel, and the three bought a case of beer and called a cab which took them to the motel. Hogan and Morris waited on the bridge while Davis registered and on his signal, subsequently joined him in his room. Hogan sat down and drank a beer. Davis stood up and removed his shirt, and Hogan took this as a signal that Davis wanted to have sex with Morris. Believing that his company was no longer wanted, Hogan left to go home. As Hogan was leaving, Davis gave him a dollar and a six-pack. When Mrs. Jackson observed him in the phone booth at approximately five to eleven, he was calling a taxi, he testified, to take him home. Jack Kanode, a driver with the City Cab Co., testified that, after receiving a radio dispatch, he drove to the Jackson Motel and picked up Hogan who he remembered from previous fares. Kanode stopped first at "Barrett's Place," where Hogan bought another six-pack of beer, and then took Hogan home. A neighbor testified that he saw someone get out of a cab in front of Hogan's house at approximately 11:00 p. m., but the neighbor could not identify the person as Hogan. Hogan's son, Steve, testified that his father drove up in a cab at about 11:00 and then went to bed. He later saw his father in bed at 11:45 and again at 1:00 a. m. Hogan's wife Irene testified at the December trial that Hogan arrived home that Friday at 10:30 and remained at home the rest of the night; she did not testify at the May trial.

Up to the point that Mrs. Jackson saw Hogan entering the phone booth, at approximately 10:55 p. m., there is no material conflict between the evidence of the prosecution and that of the defense. From that point on, however, the evidence is in irreconcilable conflict because Hogan's alibi defense directly contradicts Herbert Harriman's in court identification of him as the perpetrator of the crimes. Hogan now contends that Herbert Harriman's in court identification was unconstitutionally defective because the product of a highly suggestive out of court photo identification. Before turning to the legal merits of Hogan's claim, it is necessary for the Court to discuss the context in which the identification was made.

Herbert Harriman testified that his wife's murderer and his assailant had a goatee and a scar on the forehead above the left eye. He was not able to communicate this description immediately because he was so badly injured that he could not talk and could only communicate by sign language. During his convalescence, Harriman would periodically touch his chin and then point to the left part of his forehead above his left eye. He would also hold up three fingers. Evelyn Turman, Harriman's daughter, testified that she interpreted this sign language as her father's attempt to identify the perpetrators of the crime. Deputy Sheriff Harry Hughes, who was assigned to the case, testified that he came to understand Harriman as trying to tell him that the perpetrator had facial hair and a scar.

Deputy Hughes began to show Harriman photos from the files of the Sheriff's office while Harriman was still in the hospital. On the 29th of May, one day after Harriman had returned home from the hospital, Deputy Hughes showed Harriman a photo display containing 17 pictures—15 mug shots taken from the files of the Sheriff's Department, Hogan's Hercules Pigment employment photo, and one other non-mug photo. Among the 17 were photos of 11 white males and five black women. Hogan was the only black male in the group; his was the only representation with a scar and facial hair; and his photo was one of two which were not mug shots. When Harriman came

to the Hogan photo, he immediately identified it as the photo of his wife's murderer and his assailant and, then broke into tears. Although there was testimony that Hughes had shown Harriman photo displays which contained pictures of black males on previous occasions, there was no testimony that any of the photos were of black males with facial hair and a scar.

## II.

■ The use of pre-trial photographic identification procedures may sometimes undermine the accuracy of a later in court identification. *Simmons v. United States,* 390 U.S. 377, 383–85, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Eyewitness identifications are often fleeting and may be based upon no more than a glimpse of a perpetrator of a crime. *Id.* at 383, 88 S.Ct. 967. By contrast, the photo identification takes place in a relatively calm and tranquil environment where the eyewitness has the opportunity to linger over photos which "look like" the image of the perpetrator that the eyewitness has retained in his or her memory. Because the eyewitness "recollects in tranquility" there is the risk that the eyewitness will develop an image of the person pictured in the photograph that is more vivid than the image of the person actually seen. When the image of the person pictured on the photo is substituted for that of the person formerly seen and the two, although similar in feature, are not the same person, the "trustworthiness of subsequent lineup or courtroom identification" is undermined. *Id.; Cf. Palmer v. Peyton,* 359 F.2d 199, 201 (4th Cir. 1966). The danger of misidentification is increased when the police show the eyewitness a series of photographs in which the image of a single individual frequently recurs or is emphasized, or when the police indicate that they have other evidence that the person pictured committed the crime. *Id.* 390 U.S. at 383, 88 S.Ct. 967.

The "power" of suggestion is no misnomer. As Judge Craven wrote in *Smith v. Paderick,* 519 F.2d 70 (4th Cir. 1975);

> [P]ressured to help solve a heinous crime, often conscious of a duty to do so, and eager to be of assistance, a potential witness may be readily receptive to subtle, even circumstantial, insinuation that the person viewed is the culprit. Slip op. at 11.

■ The Supreme Court has refused to outlaw the photo identification procedure because of the substantial benefits it brings to law enforcement: photo identifications are used to effect the speedy apprehension of offenders and are often employed to promptly exonerate the innocent. *Id.* 390 U.S. at 384, 88 S.Ct. 967. In order to retain the benefits of photo identifications while still affording protection to those who may be misidentified, the Court has promulgated the rule that a conviction based on an eyewitness identification at trial which was preceded by a photo identification beforehand will be set aside only when "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* A reviewing court must therefore consider each case on its own facts to determine (1) whether there was impermissible suggestiveness; and (2) whether the "impermissible suggestiveness" created a very substantial likelihood or irreparable misidentification. Both criteria must be evaluated in light of the totality of the circumstances. *United States v. Marson,* 408 F.2d 644, 650 (4th Cir. 1969).

## III.

■ In the circumstances of this case, the Court must conclude that the photographic display shown Herbert Harriman was suggestive. Hogan was the only black male among a spread that included 11 white males and five black

females. His was the only picture with a scar and a goatee. His picture was one of two that was not a police mug shot. In sum, the photo identification procedures, or lack of same, employed by Deputy Hughes served to emphasize and give prominence to Hogan's photo. His image had such prominence and was so lacking in similarity to the images pictured on the other photos that the identification procedure employed by the Pulaski Sheriff's Department approximated, in effect, a one to one photo spread. In this, circuit, one to one photo spreads bear a heavy burden of justification. See *Kimbrough v. Cox,* 444 F.2d 8 (4th Cir. 1971) and *United States v. Workman,* 470 F.2d 151 (4th Cir. 1972).

A finding of suggestiveness does not end the matter, however, for in order to grant the writ, the Court must find further that the suggestive photo display created a substantial likelihood of irreparable misidentification. Although the facts of this case present a close question, the Court concludes for two fundamental reasons that the suggestive photo display did not creat a substantial likelihood of irreparable misidentification and therefore the petition must be dismissed.

First, the Court concludes from its review of the records that there was sufficient evidence to enable the two Pulaski juries to conclude beyond a reasonable doubt that Herbert Harriman's in court identification was premised upon an independent source—his extended period of confrontation with Hogan during the early hours of May 2, 1970. *Neil v. Biggers,* 409 U.S. 188, 200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1971).

This is not a situation where the victim had only a fleeting glimpse of the alleged perpetrator of the crimes, such as might be the case with a purse snatching or a

mugging. The Commonwealth's evidence indicates that Harriman had considerable opportunity to view his wife's murderer and his own assailant during the period of perpetration of the crimes. Moreover, he was given a second opportunity to view his assailant when he awoke from unconsciousness to find Hogan shoving his hand into a cup of hot coffee. Harriman testified at the May trial that he closely examined Hogan's features so that he would remember them if he had an opportunity to make a later identification,[3] and he testified at the December trial that he would "never forget" Hogan and his scar and goatee. (May tr. 42). His identification at both trials was very positive [4] and was subjected to extensive cross-examination.

When a victim has had ample opportunity to view the defendant at the time of the perpetration of the crime and when he or she has been subjected to cross-examination on the reliability of that out-of-court identification, this circuit has held that such confrontation may provide an independent basis for the in-court identification and may therefore remove the asserted taint on the in-court identification attributable to the suggestive photo array. *Ghiz v. Bordenkircher,* 519 F.2d 759 (4th Cir. 1975); *United States v. Sauls,* 520 F.2d 568 (4th Cir., 1975); *Stanley v. Cox,* 486 F.2d 48, 53 (4th Cir. 1973); Cf. *Coleman v. Alabama,* 399 U.S. 1, 5–6, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). The Court concludes, then, that Harriman's "extended period of anxious confrontation" with Hogan "provided a valid independent source for the in-court identification." *United States v. Sauls, supra,* 520 F.2d 569.

The Court finds yet another ground for concluding that Harriman's identification of Hogan had an independent ba-

3. "Yes, I seen him and I watched him and I watched him so I would know him." May tr. 93.

4. "I am positive of it as God is my judge." December tr. 40.

**1020**

sis. Harriman testified that Hogan was accompanied by his companions of the evening, Davis and Morris, when he returned to the motel office the second time. Although Harriman did not see Davis when he registered and did not see Morris enter Davis'. motel room and, indeed, had never seen either before the night of the robbery-murder-malicious wounding, he was still able to identify both from a photo array as the individuals who returned with Hogan the second time. Davis was later convicted of being an accessory before the fact of voluntary manslaughter, and Morris pled guilty to having been an accessory after the fact. Harriman's ability to identify from a photo array two individuals who he had never seen before, who were admittedly with Hogan at the Jackson Motel on the night of May 1, 1970, and who were subsequently convicted for their involvement in the crime substantially lessens, the Court concludes, the probability that Hogan was irreparably misidentified. Stated conversely, that Harriman successfully identified Davis and Morris increases the probability that he also correctly identified their companion, Hogan as the murderer-robber-assailant.

The Court's conclusion that Harriman's identification of Hogan had an independent source is also buttressed by the fact that Harriman was able to communicate an approximate, although admittedly imprecise, identification of his assailant—which was untainted by the suggestive photo array—through the medium of sign language and gestures.

■ Second, the Court concludes, also, that Deputy Hughes did not act in bad faith or with gross impropriety in showing Harriman this particular photo array. No deterrent purpose would be served, then, by excluding Harriman's

identification testimony at a future trial. See *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ The police, in this case, had no alternative to photo identification. The perpetrator of the crime was still at large; Herbert Harriman was the only eyewitness and, at the time of the photographic identification of Hogan, he did not have the verbal capacity to provide the police with an account of the events or a description of the perpetrator of the crimes. Necessity and the public interest in the apprehension of criminals clearly required, under the facts of this case, resort to photo identification techniques. *United States v. Cunningham,* 423 F.2d 1269, 1272 (4th Cir. 1970) (Winter, J.).

In addition, the Court views the inclusion of Hogan's photo among an array that included white males and black females as less sinister than appears at first glance. Hogan and his companions of the evening—Davis and Morris —were undoubtedly suspects, and the photo array shown Herbert Harriman contained photos of Hogan, Davis, and Morris, as well as other white males and black females. One cannot conclude that the Pulaski Sheriff's Department acted improperly in including photos of white males and black females in the photo array when Hogan had been in the company of a white male and a black female at the motel on the night of May 1. The inclusion of photos of white males and black females along with that of Hogan was not irrelevant to the law enforcement goal of identifying the perpetrators of the crimes.

For the reasons stated in the memorandum, sumary judgment will be granted to the respondent and the petition will be dismissed.

An appropriate order shall enter.